```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF RHODE ISLAND
```

_____
                                    )
THE PROBATE COURT OF THE CITY       )
OF WARWICK, by and through          )
JUDITH A. LAWTON, et al.,           )
                                    )
        Plaintiffs,                 )
                                    )
    v.                              )   CA. No. 07-239 S
                                    )
BANK OF AMERICA CORP.,              )
as Co-Executor of the Estate of     )
Magda Burt,                         )
                                    )
        Defendant.                  )
_____)

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

Plaintiffs in this lawsuit are residuary beneficiaries of an estate for which Defendant Bank of America Corp. was co-executor. They claim that Defendant breached its fiduciary duties in connection with the probate sale of stock in a company called Nyman Manufacturing ("Nyman") in 1995. According to Plaintiffs, Defendant failed to stop Nyman from buying back the shares from the estate at a bargain price, resulting in wasted assets. At trial, Plaintiffs intend to rely on expert testimony that the value of the stock was higher than what the company paid on the sale date. Defendant now moves to disqualify Plaintiff's valuation expert on grounds that her testimony is unreliable, and that Plaintiffs committed disclosure violations.

For the reasons set forth below, Defendant's motion is denied, and as a result Plaintiffs' expert will be allowed to testify. However, Plaintiffs must pay the costs of any additional discovery Defendant wishes to conduct regarding the expert's proposed testimony.

## I. Background

The most valuable asset of the estate at issue in this case was the Nyman stock. In August, 1995, the company offered to redeem it at a price of $145.36 per share. The Probate Court for the City of Warwick, which was administering the estate at the time, ordered the sale to take place on November 6, 1995. Plaintiffs claim Defendant should have opposed the sale and obtained an independent valuation of the shares, which went for a much higher price when another company acquired Nyman in 1997.

Plaintiff's valuation expert, Peri Ann Aptaker, was originally retained in 2001 in connection with an earlier stage of litigation over the estate. In 2002, she prepared a valuation of the Nyman stock as of the sale date, concluding it was worth more than $145.36 per share. After filing this action, Plaintiffs hired Aptaker again in 2008. According to Plaintiffs, all they need to do to prove liability at trial is demonstrate that Defendant permitted the shares to be sold too cheaply. To that end, Plaintiffs decided that Aptaker could rely on her 2002 valuation report as the basis for her

2

testimony. There was no need, they felt, to have her start from scratch.

Accordingly, Plaintiffs disclosed the 2002 report to Defendant pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. The report stated that the accounting firm where Aptaker works would "maintain complete and orderly workpapers documenting and providing support for [her] findings." (Summary Appraisal of Nyman Mfg. Co. Stock prepared by Peri Ann Aptaker, July 17, 2002 ("Aptaker Rep't") at 8, attached as Ex. A., Part 3 to Def.'s Mem.) In actuality, as Plaintiffs subsequently discovered, the work papers had been destroyed pursuant to the firm's standard document retention policy. However, at the time, they believed this would not prevent Aptaker from supporting and explaining her opinion.

Nevertheless, Aptaker's deposition on July 29, 2009 apparently revealed some weak spots in her memory. Plaintiffs thus asked her to go back and either reconstruct her work papers for calculations she could not fully describe, or to find independent support for them. They gave Aptaker additional financial records from the company that she did not have in 2002. Using those materials, Aptaker prepared new adjustments designed to substitute for data inputs she could not remember. Specifically, she abandoned several computations that had originally been based on average industry information collected

in 2002, which was lost when her work papers were discarded. Aptaker also tweaked her substantive analysis in several respects. She incorporated each of these changes into a supplemental valuation report.

Defendant filed the instant motion on September 30, 2009, which was the discovery deadline in this case. The motion seeks to exclude Aptaker from testifying at trial pursuant to Rule 37(c), as a sanction for failing to comply with the disclosure requirements of Rule 26. It also attacks Aptaker's proposed testimony as inadmissible under Rule 702 of the Federal Rules of Evidence and <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993). In addition to criticizing numerous alleged methodological errors, Defendant assails Aptaker's selection of November 6, 1995, the date of the sale itself, as the proper valuation date. Instead, Defendant maintains that the correct date is August 4, 1995, the day the company extended its offer to redeem the stock.

On November 2, 2009, in conjunction with opposing the motion, Plaintiffs provided Defendant with Aptaker's second, supplemental report. In addition, Plaintiffs submitted a third report from Aptaker that sets forth a new valuation opinion as to the price of the stock on August 4, 1995.

4

**II. Discussion**

The Court held a hearing on this matter on February 8, 2010, and has considered the issues carefully. It now concludes that, while Defendant's motion raises several legitimate criticisms and concerns, it must be denied. Plaintiffs missed a disclosure deadline, but they did not do so in bad faith. In any event, the draconian sanction of precluding their expert's testimony is unwarranted in this case, for the reasons fully explained below. The Court first addresses the alleged disclosure violations, and second turns to the Daubert issue.

**A.   Alleged Disclosure Violations**

Defendant first contends that Aptaker's 2002 report is useless without her work papers. Her deposition revealed that the papers are central to the "basis and reasons" for her opinion, Defendant argues, and thus demonstrated that Plaintiffs have failed to comply with Rule 26(a)(2)(B). This, in turn, warrants exclusion of Aptaker's testimony pursuant to Rule 37(c), according to Defendant. See Fed. R. Civ. P. 37(c)(1) (authorizing sanctions when "a party fails to provide information or identify a witness as required by Rule 26(a) or (e)"); Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico, 248 F.3d 29, 35 (1st Cir. 2001) (explaining that Rule 37 authorizes trial courts to preclude

5

experts from testifying where their reports omit necessary information).

At a minimum, it is clear that Aptaker could not defend parts of her original report without her work papers. By Plaintiff's own admission, Aptaker "was unable at the time [of] her deposition testimony . . . to fully explain certain calculations and adjustments." (Pls.' Mem. at 9.) Thus, at least arguably, Plaintiffs did not fully comply with Rule 26 merely by turning over the 2002 report. However, while Plaintiffs stand by that report, they also maintain that Aptaker's proposed supplemental reports alleviate any breach of disclosure the Court may perceive. Rule 26(e) obligates a party to "supplement or correct" a disclosure "in a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect." Fed. R. Civ. P. 26(e). Thus, assuming the initial disclosure was insufficient, the issue becomes whether Plaintiffs nevertheless discharged their Rule 26 duties by submitting updated reports.

Plaintiffs' effort to avoid sanctions based on the late disclosure of the new reports faces two problems, one of timing and one of substance. First, Rule 26(e) does not excuse late or incomplete disclosures. See 8A Charles Alan Wright et al., Federal Practice & Procedure § 2049.1 (3d ed. 2010) ("[Rule 26(e)] is not an invitation to hold back material items and

6

disclose them at the last moment. . . . Belated disclosure gives rise to a motion for sanctions under Rule 37(c)."). "Indeed . . . the duty of a party to seasonably supplement its disclosures under Rule 26(e) carries with it the implicit authority of the district court to exclude such materials when not timely produced even if there was no rigid deadline for production." Wilson v. Bradlees of New England, Inc., 250 F.3d 10, 20 (1st Cir. 2001) (internal citation and quotation marks omitted). Here, Plaintiffs submitted Aptaker's revised reports after the close of discovery, clearly in an effort to correct a deficiency exposed during the discovery process. Consequently, the Court is free to preclude Aptaker from offering any testimony premised on the supplemental reports, and thus to reject Plaintiffs' attempt to cure the deficiencies in the original disclosure. See id. Such a ruling could, in turn, result in the possible exclusion of Aptaker's testimony altogether because, without the supplemental reports, Plaintiffs may have failed to meet their obligations under Rule 26. The original report may also be more vulnerable to exclusion under Daubert than the new analyses.

All the same, the Court retains substantial discretion to allow supplemental disclosures provided there is no "egregious delay, prejudice, or bad faith involved." In re MTBE Prods. Liab. Litig., 643 F. Supp. 2d 471, 481 (S.D.N.Y. 2009). In this respect, Plaintiffs' delay was not "egregious," as they

7

delivered the supplemental reports only slightly more than a month after the close of discovery. More importantly, Plaintiffs did not withhold or destroy Aptaker's work papers, and were not even aware the documents had been discarded when they retained her. There can thus be no suspicion that Plaintiffs attempted to gain an unfair advantage by hiding the basis of Aptaker's opinion. Rather, at worst, Plaintiffs took an ill-advised shortcut without assuring the preservation of the work papers. Instead of commissioning Aptaker to mint a new valuation from raw data, they opted to recycle her 2002 opinion to save costs. While perhaps imprudent, particularly in hindsight, this choice was not made in bad faith, and the Court will therefore allow Plaintiffs some leeway to supplement the 2002 report.

Defendant, however, raises a second potential obstacle for Plaintiffs: Rule 26(e) only allows a party to remedy "incomplete or incorrect" initial disclosures. It is not a license to advance new theories of liability, or to overhaul the logic of an opinion that the opposing party has dismantled in the course of discovery or motion practice. See Hartford Ins. Co. v. Gen. Elec. Co., 526 F. Supp. 2d 250, 253 (D.R.I. 2007) ("[T]he purpose of supplementation is not to introduce wholly new opinions."); see also Gallagher v. S. Source Packaging, LLC, 568 F. Supp. 2d 624, 631 (E.D.N.C. 2008) ("Courts distinguish 'true

8

supplementation' (e.g., correcting inadvertent errors or omissions) from gamesmanship, and have therefore repeatedly rejected attempts to avert summary judgment by 'supplementing' an expert report with a 'new and improved' expert report.").

This Court certainly does not wish to reward disclosure missteps with the opportunity to smuggle in new expert arguments. However, there is no clear line between making corrections and shifting theories, and Aptaker's new reports cannot be said so clearly to overshoot the boundary that they must be rejected pursuant to the prohibition against "wholly new opinions." Hartford Ins., 526 F. Supp. 2d at 253. There is no dispute that, in Aptaker's amended valuation opinion for November 6, 1995, she relies on company financial information that she did not have in 2002. The internal records, according to Plaintiffs, allow her to forego reference to comparative industry data that she could not recall at her deposition.[1] These measures qualify as the type of repairs to "incomplete or incorrect" disclosures envisioned by Rule 26(e).

Aptaker's supplemental report valuing Nyman's stock on August 4, 1995, arguably strays closer to forbidden territory,

---

[1] Defendant protests that the supposedly "new" data was not truly unavailable at the time of the initial disclosure. It had been provided to Plaintiffs' counsel during a prior stage of litigation; Plaintiffs simply chose not to give it to Aptaker, and instead relied on her earlier work. Defendant, however, does not dispute that Aptaker herself did not have the data when she prepared her original report.

beyond what Rule 26(e) allows.  Yet, in this context, the Court perceives no prejudice or bad faith in permitting Plaintiffs to make an apples-to-apples comparison to the proposed testimony of Defendant's expert.  Plaintiffs say they did not know Defendant thought the stock should be valued as of the day of the offer, instead of the sale, until the instant motion was served.  In fact, Plaintiffs may be a step ahead of Defendant in terms of compliance with Rule 26.  According to them, Defendant did not identify August 4, 1995 as the relevant valuation date in its own expert disclosure.  Defendant does not refute this charge, but rather suggests that it was obvious the offer date is the correct measuring point.  (See Def.'s Reply Mem. at 8 ("[I]t is hard to contemplate how Plaintiff could be surprised at the appropriateness of this date for valuation purposes.").)

Ultimately, the Court discerns no clear abuse of Rule 26(e) in the content of Aptaker's supplemental reports.  And while Plaintiffs overshot the discovery deadline, this infraction does not call for the maximum penalty of exclusion of the expert.  At oral argument on this matter, it became clear that the sanction of preclusion could "carr[y] the force of a dismissal," because Aptaker's testimony might very well be necessary to prove Plaintiffs' case.  Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 79 (1st Cir. 2009).  In such circumstances, the Court must consider whether one of the "less severe sanction[s]" authorized

10

by Rule 37, such as the imposition of costs or fees, would be appropriate. Id. at 77-78.

Accordingly, the Court will allow Aptaker to offer testimony based on each of her three valuation reports. Defendant will be allowed to take a supplemental deposition of Aptaker, and may supplement its own expert's report, if necessary. Plaintiffs will bear Defendant's reasonable costs and attorneys' fees for any additional discovery it wishes to take from Aptaker.

### B. Daubert Challenge

Apart from disclosure issues, Defendant also contends that any expert testimony Aptaker intends to offer based on her 2002 valuation of the Nyman shares is inadmissible under Rule 702, because it is neither "based upon sufficient facts or data" nor the "product of reliable principles and methods." Fed. R. Evid. 702. When faced with Rule 702 challenges, the Court must apply the familiar gatekeeping standards for the admissibility of expert evidence articulated in Daubert. It must assure that the "reasoning or methodology underlying the [proposed] testimony is scientifically valid and . . . that [the] reasoning or methodology properly can be applied to the facts at issue." Daubert, 509 U.S. at 592-93.

Defendant does not dispute that Aptaker, who holds the designation of Certified Business Appraiser, is generally

11

qualified to opine on the value of a business. Rather, it argues that her valuation of the Nyman stock is both unsupported by authority and unreliable. Defendant begins by assaulting several of Aptaker's threshold choices in preparing her analysis. It notes that she considered two possible valuation methods, one known as the cost or net asset method, and the other called the income or discounted cash flow ("DCF") method. Defendant blasts Aptaker for giving no weight whatsoever to the results of her net asset analysis, and placing all the weight in her opinion on DCF. As indicated above, Defendant also criticizes the selection of November 6, 1995 as the valuation date, since the company extended its offer months earlier.

Defendant goes on to excoriate a number of specific data inputs, assumptions, and calculations Aptaker used in the income approach as devoid of any support in accepted valuation practice. It asserts that she made baseless assumptions regarding the company-specific risk premium, growth rate, and minority and marketability discounts applied to the company. Aptaker then compounded these errors, Defendant proclaims, by using unsound methods for analysis of the data. Most notably, Defendant castigates Aptaker for giving 100% weight to a single year of earnings, 1995, and ignoring the prior four years. Unquestionably, this boosted her income projections

12

significantly, since revenues shot up in 1995 after the company lost money in the early nineties.

Although some of Aptaker's choices appear to be problematic,[2] the Court is not prepared to reject her testimony on Daubert grounds at this stage of the proceedings. One reason for the Court's conclusion is the nature of the discipline at issue. Company valuation is fraught with variability, because it depends on so many hypothetical factors. This indeterminacy does not mean that the practice is inherently unreliable. Rather, it merely reflects the fact that accepted valuation techniques obligate an expert to make "a variety of simplifications, assumptions, and estimates" based on reasoned judgment and professional training. Lucian Ayre Bebchuk and Marcel Kahan, Fairness Opinions: How Fair Are They and What Can

---

[2] Another calculation that stands out involves a $1.5 million adjustment that purportedly reflects the useful life of the company's assets. Defendant faults Aptaker for failing to explain the adjustment at her deposition, but even worse, it maintains, was her use of the number at a subsequent stage of analysis. She made an "excess asset" adjustment based on comparing the company's net fixed asset ratio to the industry average, drawn from the lost comparative industry data mentioned above. She found Nyman's asset ratio exceeded the average by 2%, which translated into "excess" fixed assets of $600,000. But of course, her earlier $1.5 million adjustment was what bumped up Nyman's asset ratio above the average in the first place. In combination, the two asset adjustments amount to sleight-of-hand, according to Defendant. Aptaker artificially inflated the value of the company's assets, compared it to an outside source that said similar companies do not have or need that much, and then booked the difference as additional value. In Aptaker's new valuations, she lowers her $1.5 million asset adjustment and scraps the "excess asset" maneuver.

Be Done About It?, 1989 Duke L.J. 27, 34 (1989) (discussing techniques for the valuation of companies or stock in the context of "fairness opinions" for corporate transactions). "Since analysts simplify, assume, and estimate in different ways that are all reasonable and justifiable, they often arrive at different estimates of fair price." Id. Indeed, both Plaintiffs and Defendant in this case cite the same source that emphasizes the role of the valuation expert's "professional judgment" in formulating the necessary assumptions.[3] See Shannon P. Pratt & Alina V. Niculita, Valuing a Business 475 (2008).

Without hearing Aptaker's testimony, the Court is not convinced that her opinion, as a whole, falls outside the ample margins for individual judgment afforded to practitioners in her profession. Granting Defendant's Motion would thus be premature, especially since this matter will be tried to the Court. Indeed, the Court may conduct a fuller Daubert examination at the trial itself, without danger of prejudice. If Aptaker's testimony turns out to be unreliable, Defendant may

---

[3] Of course, as the Court has previously observed, an expert cannot justify an assumption with nothing more than an ipse dixit: she cannot simply assure the Court that the choice reflects her professional judgment. See Hartford Ins. Co. v. Gen. Elec. Co., 526 F. Supp. 2d 250, 259 (D.R.I. 2007). However, despite Defendant's argument to the contrary, Aptaker does appropriately go beyond the "because I said so" rationale in defending much of her opinion. The Court may, of course, conclude otherwise with respect to some or all of her analysis at trial, after the opportunity to hear her testimony.

14

renew its motion to exclude her, and the Court will consider its argument; or, more likely, the Court will consider whatever weaknesses Defendant may expose in Aptaker's conclusions and methodologies in determining the weight to give to her testimony. Another district court in this Circuit recently took a similar course of action when faced with Daubert challenges to competing company valuation experts in the context of a bench trial:

> I reject the Daubert challenge to both the testimony and the associated exhibits. This is not the stuff of ordinary expert testimony, involving physics, engineering or medicine. . . . [T]he determination of fair value is more akin to an artistic composition than to a scientific process. . . . Each of th[e] witnesses has the credentials and experience to speak to [the] issue, . . . through practical experience . . . . [or] study, training, writing and prior expert testimony. Moreover, I sit here as a judge, not a jury. Mistakes, omissions, inconsistencies or failure to follow appropriate methodology (and there are some) will affect the weight I give to their respective analyses and conclusions.

Kaplan v. First Hartford Corp., 603 F. Supp. 2d 195, 197 (D. Me. 2009) (internal quotation marks and citations omitted).

This approach is appropriate here. The Court plans to scrutinize closely the basis, reasoning, and assumptions underlying Aptaker's opinion at trial. Now that Plaintiffs will be permitted to rely on her supplemental reports, Defendant may feel inclined to renew its Daubert objection based on the unreliability of the opinions set forth in those disclosures as

15

well. Defendant would be well-served to incorporate that argument into the supplemental pretrial memorandum it has been directed to submit, and to pursue it orally during trial, rather than launch a new round of pretrial motion practice.

### III. Conclusion

For the reasons set forth above, Defendant's motion is DENIED. Aptaker may testify at trial and may rely on all three of her reports. As noted above, Plaintiffs must pay Defendant's reasonable costs and attorneys' fees in connection with any additional discovery required from Aptaker as a result of her supplemental reports.

IT IS SO ORDERED.

*/s/ William E. Smith*
William E. Smith
United States District Judge
Date:  April 14, 2010