_____
                                          )
THE PROBATE COURT OF THE CITY OF          )
WARWICK, by and through                   )
JUDITH A. LAWTON, JOAN GRANT,             )
CAROL LINCOLN, JANICE LEFFINGWELL,        )
JOYCE HENDRICKS, JOHN KIEPLER as          )
executor of the Estate of                 )
Beverly Kiepler, JANIS FISHER,            )
DAVID GILMORE and                         )
RAYMOND P. CYR, JR.,                      )
                                          )
          Plaintiffs,                     )
                                          )
     v.                                   )   CA. No. 07-239 S
                                          )
BANK OF AMERICA, N.A. as                  )
co-executor of the Estate of              )
Magda Burt,                               )
                                          )
          Defendant.                      )
_____)


**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

     Nine of the ten residuary beneficiaries ("Plaintiffs" or

"Beneficiaries")[1] named in the will (the "Will") of Magda L. Burt

---

[1] The nine residuary beneficiaries who are plaintiffs in
this suit are Judith Lawton, Joan Grant, Carol Lincoln, Janice
Leffingwell, Joyce Hendricks, Beverly Kiepler (by John Kiepler,
as executor of her estate), Janis Fisher, June Gilmore (by David
Gilmore, as executor of her estate), and Raymond Cyr. The one
residuary beneficiary who is not a plaintiff in this suit is
Roland Burt. In this opinion, the Court will use the term
"Beneficiaries" sometimes to refer to all ten residuary
beneficiaries and sometimes to the nine who are plaintiffs in

("Decedent") have brought suit claiming that Bank of America Corp. (the "Bank"), a co-executor of Decedent's estate (the "Estate"), has breached the fiduciary duties it owed to them. For the reasons that follow, the Court finds that the Bank breached its fiduciary duties to Plaintiffs and is liable to some of them in the amounts provided below.

The case was tried before this Court without a jury on October 25-29, 2010; November 1-2, 2010; and May 9-11, 2011. Having considered the evidence presented at trial and the pre-trial and post-trial memoranda submitted by the parties, the Court makes the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a). To the extent that any finding of fact reflects a legal conclusion, it should be to that extent deemed a conclusion of law, and vice versa.

I.   FINDINGS OF FACT

1.   Decedent died on August 30, 1987.

2.   Decedent's Will left the rest and residue of her Estate, including 2,256 shares of Class A non-voting common

---

this case. The context will make clear which meaning is intended, and the Court will clarify if necessary.

stock (the "Stock")[2] of Nyman Manufacturing Co. ("Nyman" or "the Company"), to the Beneficiaries.

3. Nyman was a closely held Rhode Island corporation that manufactured and sold disposable food containers.

4. There was no public market for the Stock.

5. Nyman was a family business. It was managed at the time of Decedent's death by Walfred Nyman and his sons Robert and Kenneth. Walfred Nyman died in 1989, and the Company's management passed to his sons.

6. Decedent was Walfred Nyman's sister. All the Beneficiaries were family members or relatives of Decedent and of each other. For example, Beneficiaries Judith Lawton and Beverly Kiepler were sisters of Robert and Kenneth Nyman.

7. The Beneficiaries had no meaningful experience and no sophistication in financial dealings, including in transactions involving the stock of closely-held corporations.

8. On October 8, 1987, the Will was admitted to probate, and Robert Gates and the Rhode Island Hospital Trust ("RIHT") were appointed co-executors of the Estate.

---

[2] Throughout this opinion, the Court will use the term "Stock" sometimes to refer to shares of Class A non-voting common stock of Nyman in general and sometimes to the 2,256 shares that are at issue in this case in particular. The context will make clear which meaning is intended, and the Court will clarify if necessary.

9.    RIHT subsequently became part of the Bank, and the Bank succeeded RIHT as co-executor.  Both RIHT and the Bank will be referred to as the Bank.[3]

10.  Notice  of  the  co-executors' qualification  was published on October 27, 1987, starting the creditors' claim period.

11.  On October 27, 1987, the Bank noted the need for a valuation of the Stock and assigned one of its internal units to undertake the valuation.

12.  The internal valuation, concluded in February 1988, valued the Stock at $383.04 per share as of August 31, 1987 for estate tax purposes.

13.  The creditors' claim period for the Estate expired on April 27, 1988.

14.  In May 1989, the Internal Revenue Service ("IRS") selected the Estate for audit.  Pursuant to its audit, which concluded in October 1989, the IRS increased the value of the Stock for estate tax purposes from $383.04 (the Bank's initial valuation) to $403.35 per share.  The Bank paid the IRS $24,604 in taxes as a result of the increased valuation.

---

[3] Defendant Bank is variously referred to as "Bank of America Corp." and "Bank of America, N.A." in the parties' submissions.  These entities are one and the same for our purposes and will be referred to as the Bank.

15.  On October 27, 1989, the co-executors filed an order of distribution with the probate court.

16.  Some time early in the administration of the Estate (it is not clear exactly when), the co-executors approached Nyman to see if it would be interested in buying the Stock from the Estate.  Nyman responded negatively.

17.  The co-executors did not specify a price when they approached Nyman to gauge the Company's interest in buying back the Stock.

18.  On February 28, 1990, Robert Tyler, the Bank official primarily responsible for the Estate (and the person testifying on behalf of the Bank at trial), wrote to the Beneficiaries that the co-executors had paid the extra Rhode Island State taxes that had become due as a result of the IRS audit.  He reported that, once the State acknowledged receipt of the payment and confirmed that no more taxes were due, "we will file a First and Final accounting of the executors with the Warwick Probate Court as soon as possible."  The letter went on to state:

> That accounting is presently being prepared.  A copy of that accounting will be sent to you for your review and approval as soon as it is complete.  As soon as we have received your approval of the accounting, we will record that approval with the probate court.  As soon as we have received all the beneficiaries approval [sic] and the court approval, we will distribute the remaining assets in the estate account immediately.

19.  On May 25, 1990, Judith Lawton, one of the Beneficiaries, wrote to Tyler,

> Three months ago you indicated a First and Final Accounting was then being prepared for the beneficiaries' apprroval [sic.] so it could be filed with the Warwick Probate Court.  Would you please update me regarding the progress of that accounting as we begin to approach the three-year anniversary of Mrs. Burt's death.

Judith Lawton also communicated with Tyler by telephone and mail on several other occasions to inquire about the progress of the Estate.  Tyler responded to some of these communications.  His responses were to the effect that the co-executors were at work finalizing the accounting of the Estate and would be done with it soon, within weeks or months.

20.  On July 11, 1990, Gates, the other co-executor, sent Tyler a copy of the final Rhode Island State tax bill.[4]  Gates also asked Tyler to "prepare the final accounting for the . . . estate so that I may file it with the Probate Court and close the estate."

21.  On July 18, 1990, Tyler responded to Gates's letter: "We have begun preparing the estate accounting for the executors and expect that it will be completed within several weeks.  As soon as this is available, I will send it to you for your review

---

[4]  This, along with the absence of any other credible evidence on this score, indicates that the Rhode Island State tax issue referenced in Tyler's letter of February 28, 1990, see supra ¶ 18, was resolved as of July 1990, if not earlier.

and approval prior to sending it to the beneficiaries for their assent."

22. On October 2, 1990, Judith Lawton wrote to Tyler again, expressing frustration with unkept promises that information about the Estate would be coming "within the week." She wrote,

> February 28th you wrote that a First and Final Accounting was then being prepared for the beneficiaries' approvals so it could be filed with Warwick Probate Court. That was seven months ago. A month ago you told me that the Accounting Group was then preparing a summary. I am now requesting a formal update on this account stating when you expect the final documents to be prepared. This estate has been in your hands THREE years.

23. On November 23, 1990, Gates wrote to Tyler again to inquire about the status of the final account for the Estate.

24. On November 29, 1990, Tyler responded to Gates, indicating that the first and final account was "being prepared" and would hopefully be available for Gates's review "within a few weeks." Tyler explained that the "delay in the preparation of the account has been caused by adjustments to the computer records to reflect the many exchanges of worthless, replaced, and obsolete securities which Magda Burt held."

25. On December 2, 1990, having not received a response to the part of her October 2 letter that had to do with the Estate, Judith Lawton wrote to Tyler again requesting an update on the Estate.

26. On January 18, 1991, Tyler distributed $1,000 to each of the Beneficiaries as "partial principal distribution of [the] residuary estate." He also wrote that the "estate accounting has been completed and will be sent to you for your review and approval."

27. On February 25, 1991, Gates inquired of Tyler again about the status of the accounting: "Your letter to me dated November 29, 1990, indicated that you were preparing the First and Final Account for the [Estate] and that a draft would be ready for review within a few weeks. Please let me hear from you regarding the status of this matter."

28. On March 1, 1991, Tyler sent Gates a first and final account, indicating that he would send it to the Beneficiaries once Gates approved it.

29. On March 11, 1991, Gates wrote back that he had reviewed the first and final account and that it appeared to be in order for mailing to the Beneficiaries.

30. On March 18, 1991, Tyler sent to the Beneficiaries a first and final account covering the period August 30, 1987 to January 3, 1991. Along with the accounting, Tyler enclosed a receipt and release (or indemnity) form which he asked them to sign and return if they approved of the accounting, so that the form and the accounting would be filed with the probate court.

31. Schedule B-6 of the first and final account, entitled "Distribution-Principal," showed all 2,256 shares of the Stock as having been distributed in kind to the Beneficiaries, 225.60 shares each, on various dates between 1987 and 1990. However, in fact, none of the Stock had been distributed to the Beneficiaries during that time (nor was it ever distributed).[5] Tyler knew that the Stock had not been distributed to the Beneficiaries; nevertheless, he recorded distributions to all Beneficiaries and inserted random dates for the distributions because he believed the Bank's computer program would not permit completion of the form for the accounting otherwise.

32. One example of the receipt and release form accompanying the accounting read as follows:

> I, Ronald W. Burt Jr., hereby acknowledge receipt from Robert B. Gates, Esq., and Rhode Island Hospital Trust National Bank, Co-executors of the Will of Magda L. Burt, of the following-described property:
>
> Cash
> Principal Cash      $3,138.96
> Income Cash         $104.30
>
> which, together with prior distributions, constitutes full payment and satisfaction of the rest, residue, and remainder of this estate, and having examined said Co-executor's [sic] account covering the period from August 30, 1987, to January 3, 1991, and being satisfied therewith I hereby release and discharge

---

[5] Indeed, Tyler's letter referred to the distributions reflected in the accounting as "proposed distributions" (emphasis added), even though the first and final account itself showed the shares as actually having been distributed on specific dates.

said Rhode Island Hospital Trust National Bank and
Robert B. Gates, Esq., from all claims, demands,
causes of action and further accountability respecting
said estate.

In consideration of the payment aforesaid being
made at this time, without certainty of final
adjustment of tax liability, I agree, for myself and
my successors and assigns, to refund and return my
proper proportionate share of such sum or sums as may
ultimately be required by the co-executors for the
payment of additional estate, inheritance, or income
taxes, interest, and legal fees hereafter assessed
against and determined to be payable by this estate.[6]

33. On April 9, 1991, attorney Thomas Pearlman entered his
appearance as counsel for Beneficiary Roland Burt and demanded
"a complete audit of all assets and liabilities [in the Estate]
and an appraisal thereof."

34. During the course of the next few years, Roland Burt,
through Pearlman, questioned the Co-Executors' handling of the
Estate and demanded from them many documents, including a copy
of the first and final account. Pearlman would usually
communicate with Gates, who would forward his requests for
information to Tyler.

35. On June 25, 1991, Gates wrote to Tyler, "Would [you]
please advise me of the status of the objection by Roland W.
Burt Jr. to the Final Account and whether or not the Final
Account is now in order for filing with the Probate Court."

---

[6] The other receipt and release forms are substantially
identical, except that the cash amounts differ slightly for some
Beneficiaries.

36. On July 28, 1991, Pearlman wrote to Gates that his "client is very upset on the way this Estate was handled," and threatened litigation "[u]nless arrangements can be made to make good on . . . losses" sustained by the co-executors' alleged mishandling and overcharging of the Estate. There were subsequent threats and communications.

37. On October 21, 1991, Tyler sent to Roland Burt what he called a "revised accounting" of the Estate. This revised accounting was different from the first and final account previously sent--in that it did not identify the Stock as having been distributed and showed the balance of undistributed property remaining in the Estate.

38. Tyler also enclosed a "modified receipt form" which he asked Roland Burt to sign. Unlike the receipt and release form sent on March 18, 1991, which asked the Beneficiaries to accept the distributions hitherto made as "full payment and satisfaction" of their interest under the Will, this modified receipt form simply asked for an acknowledgment of receipt of the property indicated in the accounting.

39. On October 24, 1991, Tyler sent the revised accounting, as well as the modified receipt form, to Gates. Tyler asked Gates to review these documents and indicated, "With your approval, I will send the Account out to all the beneficiaries with the receipt . . . . I will also inform them

that we plan to file the First Account and ask for its allowance in the Warwick Probate Court."

40.  The Bank did not send this revised accounting and modified receipt form to any of the Beneficiaries except for Roland Burt.[7]

41.  In 1992, the Office of the Comptroller of the Currency (which regulates national banks) issued new regulations mandating that banks conduct an annual review of certain closely held assets.  This new mandate applied to shares of the Stock held by the Bank as co-trustee of the Walfred Nyman Trust.  This stock was the same class as the stock in the Estate held for the Beneficiaries by the co-executors; however, it was held for the Walfred Nyman Trust and not for the Estate.

---

[7] There is a dispute between the Bank and the Plaintiffs as to whether these documents were sent to the Beneficiaries at about this time in October 1991.  The Court finds that they were not.  Tyler's October 24 letter to Gates--which indicates that he "will send the Account out to all the beneficiaries with the receipt" (emphasis added) once Gates has approved them--shows that they had not been distributed to the Beneficiaries (except for Roland Burt) up to that date.  And the fact that there are no letters or other records of the revised accounting and modified receipt having been sent to the Beneficiaries at around this time, or of Gates informing Tyler that he had approved them and they were ready to be sent to the Beneficiaries, coupled with the fact that there is ample documentation of all other communications and distributions to the Beneficiaries regarding the accounting, makes it far more likely that the revised accounting and modified receipt were never sent to the Beneficiaries other than Roland Burt.  This conclusion is bolstered by the fact that almost a year later, in September 1992, Tyler wrote to the Beneficiaries that "[t]he final accounting for the . . . estate will be mailed to you shortly." See infra ¶ 46.

42.   In compliance with these new regulations, the Bank's Closely-Held Business Group reviewed Nyman's financial information and undertook annual valuations of these shares. The valuations are as follows:

| Date | Carrying Value per share | Book Value per share |
|---|---|---|
| 02/25/1992 | $104 | $453 |
| 06/22/1993 | $104 | $491 |
| 03/22/1994 | $104 | $496 |
| 04/25/1995 | $14 | $14 |
| 04/25/1995 (revised) | $182 | $182 |
| 02/27/1996 | $182 | $182 |
| 04/23/1996 | $104 | $241 |

43.   On March 17, 1992, James Ross, First Vice President at the Bank, advised Robert Nyman, co-trustee of the Walfred Nyman Trust, that the Bank's $104 per share valuation was "at a deep discount" from $453 per share, which would be the value obtained "based on book value which is a normal way to view the company value."   Ross explained that the deeply discounted value "translates into a lower trustee fee."   As the chart shows, in subsequent years, the Bank sometimes suggested a carrying value at a discount from book value and sometimes simply took book value as carrying value.

44.  On July 10, 1992, Tyler advised Gates that he had received several requests from the Beneficiaries for "at least a partial distribution of the estate residue at this time," and asked him what he thought of that.  He also asked  Gates to review "the status of the account termination" and to "advise on how we should communicate to the residuary beneficiaries concerning the status of the estate accounting."

45.  On July 13, 1992, Gates wrote back that he had no objection to a partial distribution, provided the Beneficiaries executed indemnification agreements.  He added that the Beneficiaries should be advised that Roland Burt, through his attorney, was still requesting information regarding the Estate.

46.  On September 4, 1992, Tyler sent $282.80 in accumulated income from the Estate to each Beneficiary.  He added, "The final accounting for the above referenced estate will be mailed to you shortly."

47.  On September 22, 1992, in the course of relaying another one of Pearlman's requests for information to Tyler--which he had been doing regularly since Pearlman's entry of appearance on behalf of Roland Burt--Gates wrote, "If we cannot reach a prompt resolution of this matter with Attorney Pearlman, after we have furnished all available information to him, then we should file the accounting with the Probate Court and request a hearing."

48. On January 15, 1993, Gates advised Pearlman that Nyman was not interested in buying the Stock, so it would be distributed in kind to the Beneficiaries.

49. On January 31, 1993, Pearlman wrote to Gates that Roland Burt would file suit if his outstanding issues regarding the administration of the Estate were not resolved within twenty days.

50. On February 2, Gates replied: "I am afraid there is nothing to settle here and that you will have to take whatever action you deem necessary."

51. On the same day, Gates informed Tyler of his correspondence with Pearlman and asked him for "a corrected First Account which I intend to file with the Probate Court."

52. On February 11, 1993, Tyler sent Gates an accounting of the Estate covering the period August 30, 1987 to January 3, 1991. He indicated that the Bank was "presently" updating the accounting through February 1, 1993 and would forward the updated accounting to Gates "as soon as this is complete."

53. Gates wrote back the next day, noting that the accounting should run from October 8, 1987 (the date of the co-executors' qualification), not August 30, 1987 (the date of Decedent's death), and he asked for an updated accounting "as soon as possible for filing with the Probate Court."

54. On February 26, 1993, Pearlman sent Gates a draft complaint which he said he would file in ten days if the matter was not amicably settled.

55. On March 3, 1993, Gates forwarded Pearlman's letter and draft complaint to Tyler and asked, again, for "the completed First Account so that I may file it with the Court."

56. On March 12, 1993, Roland Burt, represented by Pearlman, filed suit in Rhode Island Superior Court against the Bank, "individually and as executor of the estate of Magda L. Burt," alleging negligence and breach of fiduciary duties in administering the Estate.

57. On March 31, 1993, the Bank, by its attorney Gates,[8] filed an answer denying all allegations of wrongdoing.

58. On May 12, 1993, Tyler and Gates met with Roland Burt and Pearlman to discuss Roland Burt's misgivings about the administration of the Estate. They did not get far. Pearlman did not explain Roland Burt's concerns to Gates's satisfaction and instead took him for a walk in a cemetery. At the end of the meeting, the co-executors still did not understand specifically what it was that Roland Burt was complaining about, and Roland Burt was not satisfied with the co-executors' explanations.

---

[8] Partridge Snow & Hahn LLP later replaced Gates as the Bank's attorney and represents the Bank in the present suit.

59.  On the same day, Gates wrote to Pearlman requesting a clarification of Roland Burt's complaints.  He added:  "But for this litigation, the estate could be finalized and the Nyman stock and the remaining cash ($20,000.00) could be distributed to the beneficiaries.  The cost of litigation is going to come from the $20,000.00."

60.  During the course of the co-executors' subsequent communications with Roland Burt and Pearlman, it became clear that Roland Burt wanted cash for his shares of the Stock.  Gates indicated to Pearlman that the co-executors had already attempted to sell the Stock back to Nyman, but Nyman would not buy it.  Nevertheless, Roland Burt's insistence prompted the co-executors to ask Nyman again about the prospects for a buyback of the Stock.

61.  On August 3, 1993, Tyler wrote to Nyman, inquiring as to "the company's prospects for redeeming any or all of" the Stock.  He did not specify a price.  He also asked if Nyman would rather deal with the Beneficiaries individually after they had received their shares of the Stock.

62.  On August 17, 1993, Robert Nyman, President of Nyman, responded that "the prospects for such a redemption are poor at this time."  The letter noted that, despite improving conditions and a return to profitability, Nyman was still struggling; further, its loan agreements with its bank lenders would

prohibit redemption of the Stock. Nyman stated that it would have preferred negotiating with the co-executors (rather than the Beneficiaries individually), but it was in no position to do so at that time.

63. Gates informed Pearlman of Nyman's position on the redemption of the Stock, but Pearlman wrote back that "[m]y client just does not believe they do not have the funds to buy out his interest."

64. In 1993, the Rhode Island Supreme Court suspended Pearlman from the practice of law. This was neither the first nor the last time that he was suspended.

65. In March 1994, Nyman hired turnaround consultant Keith Johnson to help the Company reverse course and recover from setbacks in recent years.

66. On March 25, 1994, Tyler updated the Beneficiaries on the status of the Estate. He wrote, "Mrs. Burt's estate remains open pending the resolution of a issues [sic] raised by Mr. Roland Burt. Mr. Burt, through his attorney, Mr. Pearlman, has questioned the handling of the estate assets, specifically, the Nyman Company manufacturing stock owned by Mrs. Burt." He explained that the co-executors had approached Nyman twice, the second time at Roland Burt's request, to purchase the Stock, both times without success. Tyler further stated, "It is my understanding that each estate beneficiary may negotiate the

sale or exchange of the stock directly with the company and then any other party."  The letter concluded:

> Once the issue of the Nyman stock is resolved, we plan to file the estate accounting with the probate court and then distribute the stock and the remaining cash to the ten residuary beneficiaries.  In the interim, we[] are updating the accounting which has previously been sent to all beneficiaries and asking them for their review and approval of it.

67.  On October 5, 1994, Tyler sent Gates a draft first and final account for his review and approval.  He stated, "We plan to file the Account with Warwick Probate Court as soon as possible and seek court allowance."

68.  Gates wrote back on October 19, 1994, noting that the accounting showed the Estate as having been fully distributed whereas in reality the Stock and some cash still remained in the Estate.

69.  On December 9, 1994, Tyler sent the Beneficiaries a first and final account covering the period October 8, 1987 to September 1, 1994.  He also enclosed a receipt and release form, which he asked the Beneficiaries to execute if they approved the accounting.  Tyler closed by promising that "[u]nder separate cover you will receive the final distributions due you."

70.  Like the first and final account distributed on March 18, 1991, the first and final account distributed on December 9, 1994 showed the Stock as having been distributed in kind equally among the ten Beneficiaries (this time under Schedule B-7,

entitled "Distributions – Principal").[9]  But, in fact, the Stock had not been distributed by December 9, 1994, just as it had not been distributed by March 18, 1991, nor was it ever distributed to the Beneficiaries, "[u]nder separate cover" or otherwise.

71.  The receipt and release form enclosed with the first and final account asked that each Beneficiary acknowledge receipt from the co-executors of various distributions, including 225.6 shares (one-tenth of the total shares) of the Stock.  It also asked them to attest that these distributions, "together with prior distributions, constitute[] full payment and satisfaction of the rest, residue and remainder of this estate, and having examined said Co-executor's [sic] account covering the period from October 8, 1987 to September 1, 1994, and being satisfied therewith I hereby release and discharge said Rhode Island Hospital Trust National Bank and Robert B. Gates from all claims, demands, causes of action, and further accountability respecting said estate."[10]

72.  On the same day, Tyler informed Gates that he had sent a first and final account and a receipt and release form to each

---

[9]  However, this time, the Stock (and some other items) appeared below a line that read "Reserved for distribution." And, this time, there were no specific dates attributed to the supposed distributions.

[10]  The receipt and release form also contained language substantially identical to that of the last paragraph of the receipt and release form distributed on March 18, 1991, quoted supra in ¶ 32.

Beneficiary.  "I do not, however, expect," he wrote, "that all the beneficiaries will sign their releases."

73.  At various points between December 1994 and March 1995, Judith Lawton, Carol Lincoln, Janis Fisher, and probably also David Gilmore (as executor of the estate of his mother June Gilmore) signed and returned the receipt and release forms.

74.  On December 14, 1994, Janice Leffingwell wrote to Tyler to complain about the receipt and release form.  She wrote,

> The accord portion asks me to assume 10% of all responsibility for any and all future claims, taxes, snafus, wills, etc. levied against the estate up to the amount of my share.  Mr. Tyler, I do not have that kind of money.  I can not guarantee that amount unless I risk my home and that I will not do.

75.  Tyler did not write back or otherwise respond to Janice Leffingwell's concerns.

76.  On January 30, 1995, Robert Nyman, on behalf of Nyman, wrote to the co-executors in anticipation of what he thought would be the closing of the Estate "within the next few weeks." The letter overwhelmingly emphasized Nyman's losses and problems but also indicated that "the Company has good prospects for a turn-around and a return to, at least, a break-even performance with positive cash flow."  It went on to state that Nyman was contemplating an arrangement for some of its employees to buy Nyman stock from shareholders and asked whether the

Beneficiaries would be interested in selling their Stock and whether the co-executors would represent the Beneficiaries in negotiating such a sale. Enclosed with the letter was a valuation placing the fair market value of the Stock "in the range of $25.00 per share." However, Robert Nyman

> emphasize[d] that the Company does not make, and I do not make, any representations as to the fair value of the Class A shares or as to the propriety or accuracy of the attached analysis. Any conclusion by the estate or by a beneficiary as to the fair value of the lass shares is the sole responsibility of the estate or such beneficiary.

77. Nyman's letter of January 30, 1995 was referred to in numerous internal communications among Bank employees as an offer for the purchase of the Stock.

78. On February 17, 1995, Gates replied to Nyman that it was the co-executors' position that "any negotiations for the purchase of Mrs. Burt's Class A Nyman stock should be between the beneficiaries and the management group interested in the purchase." He went on to note that the Bank's initial valuation of the Stock (in 1988) and the IRS audit (in 1989) had assigned "a much higher value" to the Stock than "the offer amount" of $25 per share referenced in Nyman's letter.

79. On the same day, Judith Lawton wrote to Tyler (copying Gates) to

> put[] in writing a strong complaint against the finalization process of this estate. EVERY conversation with you ends with a statement that

> something, anything, will be mailed 'within the week.'
> Nothing ever is. At long last, when the December 9th
> letter came, I was cautiously optimistic regarding
> your statement that the final distributions would be
> mailed under separate cover--of course, it [sic]
> wasn't.

As for Tyler's excuse that the delay was due to Nyman's recent overture to the co-executors to serve as intermediaries between the Beneficiaries and Nyman for a potential buyback of the Stock, Judith Lawton explained that "that request has only to do with AFTER the estate is closed and the stock has been distributed," and thus "has nothing to do with this estate being finalized."[11] Judith Lawton closed by requesting that the co-executors "PLEASE expedite my aunt's estate immediately so we can ALL put it to rest. It is annoying and exasperating to hear from you every six to eight months with another pacifying letter that never amounts to anything."

80. The just quoted letter was an expression of the frustrations accumulated over the co-executors' failure to

---

[11] At that time, Judith Lawton was in close contact with Keith Johnson, the new turnaround manager at Nyman, see supra ¶ 65, who informed her of Nyman's desire to buy back the Stock and advised her that this would be a very good deal for the Beneficiaries. At the time, Judith Lawton trusted Johnson and took his advice to heart. Her feelings changed dramatically a few years later, when Johnson and other Nyman executives turned around and sold the Nyman shares that they had bought from her and other shareholders at more than ten times the price to Van Leer Corporation. See infra ¶¶ 189-190. She subsequently sued them and, after obtaining favorable judgments, settled for a substantial sum. See infra ¶¶ 191, 193.

finalize and distribute the Estate over the nearly nine years since their appointment. During those years, Judith Lawton and some of the other Beneficiaries repeatedly requested, orally and in writing, that the Estate be finalized and distributed and asked what was holding it up for so long. In response, Tyler repeatedly assured them that the co-executors were in the process of finalizing the Estate and would file an accounting with the probate court soon. Sometimes he specified that "soon" meant within weeks or months, and sometimes he left its meaning vague. Some of the Beneficiaries' requests and Tyler's responses have been excerpted above.

81. On March 2, 1995, attorney Marvin Homonoff informed Gates that he had entered his appearance on behalf of Ronald Burt (in place of the suspended Pearlman). Homonoff enclosed a Petition to Render an Account, which he said he would file unless the co-executors filed an account with the probate court.

82. On March 6, 1995, Gates filed a first and final account with the probate court and requested a hearing. This was the first accounting the co-executors filed with the probate court.

83. Gates informed Homonoff of the filing four days later.

84. This filing was followed by a series of probate court hearings, beginning on April 6, 1995 and culminating in a hearing on October 19, 1995. Various subjects were discussed at

these hearings and further information was furnished at the request of the probate court. These subjects included the finalization of the Estate, the accounting for the Estate, the fees and expenses charged by the co-executors, and Roland Burt's complaints.

85. At the first hearing on April 6, 1995, the probate court ordered that the co-executors file a proposed order of distribution.

86. On April 20, 1995, the co-executors filed a proposed order of distribution, praying that the probate court order the distribution of the assets remaining in the Estate, including the Stock. It showed the Stock at a value of $383.04 per share (per the Bank's 1988 valuation). There is no record of the probate judge signing this order of distribution or of it being entered.

87. On April 26, 1995, Joan Grant wrote to Tyler that she did not wish to sell her shares of the Stock until after she retired, and she asked whether they could nonetheless be sold without her knowledge or consent.

88. On April 26, 1995, G. Norman Otto, in-house counsel at the Bank, wrote to Tyler and others at the Bank,

> Should a partial dist. of the Nyman stock be done if
> approval of the acct drags on so the bene's can
> address the offer to purchase from corp management to
> the bene's??  Would we petition the Court to do
> partial dist??  I understand Nyman stk in estate has

had no market until this year's buy offer [i.e., Nyman's letter of January 30, 1995]. I think the risk is holding Nyman & loosing [sic.] a sale in a falling market. Also, Dist. in kind is appropriate--sooner the better??

89. The next day, Jeremy Weir, a Bank Vice President who was an expert in closely-held corporations, wrote to Otto, Tyler, and others at the Bank,

Regarding the distribution of the estate, are we free to distribute at least the non-marketable shares, i.e. Nyman stock, at any time, once tax clearances have been received? If so, why have we not done so to remove RIHT from any claim for diminution of estate assets? Given the current situation, we may wish to discuss with counsel if distributing now raises any problems. There is certainly a rationale since we have received an offer and there have been discussions of having the offer go directly to the beneficiaries.

90. At the probate court hearing on April 28, 1995, four Beneficiaries indicated that they would like to receive their shares of the Stock. The co-executors indicated that, as Roland Burt was not willing to settle his claims, they did not want to distribute further assets from the Estate for fear that they would be needed to pay the expenses arising from Roland Burt's suit. The probate court directed the co-executors to inquire from the Beneficiaries who were not present at the hearing whether they would be willing to accept their shares of the Stock in exchange for signing a general release.

91. Gates subsequently did so.

92. On May 1, 1995, in response to Gates's inquiry, Raymond Cyr signed the receipt and returned the receipt and release form that Tyler had sent to him on December 9 of the previous year.

93. Beverly Kiepler, via her husband John Kiepler, objected to the receipt and release agreement. In response, Gates sent her a general release in boilerplate form on May 2. Beverly Kiepler did not sign and return this form.

94. On May 23, 1995, Robert Nyman, on behalf of Nyman, wrote to the Bank requesting that the Bank lower the carrying value assigned to the Stock.

95. At a hearing in June 1995, the probate court requested that the co-executors provide the Beneficiaries with copies of appraisals, correspondence, tax returns, fee schedules, and other information. The probate court also directed the co-executors to modify the first and final account and make it a first account, in view of the fact that the Estate had not been fully distributed.

96. On June 26, 1995, pursuant to the probate court's order, Tyler sent the Beneficiaries a packet containing various records and documents, as well as an amended first account, covering the period October 8, 1987 to June 2, 1995.

97. Unlike the two versions of the account previously distributed to the Beneficiaries (on March 18, 1991 and December

9, 1994), the amended first account correctly categorized the Stock as an undistributed asset remaining in the Estate, rather than as an asset that had been distributed. This time, the Stock was classified under Schedule C-1 as "Principal Remaining on Hand," rather than under distributions in Schedule B.

98. In July 1995, Keith Johnson was appointed President and Chief Operating Officer of Nyman. Robert Nyman continued to serve as Chairman of the Board of Directors and Chief Executive Officer. Johnson had been involved in the management of Nyman in a senior executive capacity since well before this formal elevation.

99. On July 25, 1995, Johnson met with Gates and relayed to him an offer by Nyman to purchase the Stock for $145.36 per share. The offer was conditioned on the acceptance of all Beneficiaries by August 18 and on certain lenders' waiver of buyback prohibitions in Nyman's loan agreements. The price of $145.36 was derived by taking the book value of $181.71 from the most recent audited financials and discounting it by twenty percent due to lack of marketability and control.

100. The following day, Gates updated Tyler on Nyman's offer and Gates's response to it: "They want us to act as a go-between; however, I have advised them that we would not act in that capacity."

101. Gates also contacted Homonoff to inform him of Nyman's offer. He responded that he was not authorized to discuss the matter until after the probate court's decision.

102. At this time, Gates did not want to act as a "go-between" between Nyman and the Beneficiaries because he did not want to push a deal regarding which he did not have sufficient information nor sufficient time to gather the necessary information. Gates had not been conversant with the financial situation of Nyman; the data, if any, were in the Bank's possession. He was leery of Nyman's offer because, based on his limited knowledge, he thought the information provided by Nyman portrayed the Company in too bleak a light and the offer price of $145.36 per share was too low. Based on his information at the time and without further investigation (which further investigation the co-executors never undertook), Gates believed that a fair price would be $403.35 per share. This was the value arrived at by the Bank's valuation for estate tax purposes as adjusted by the IRS audit. See supra ¶ 14. Even though this valuation was as of the date of Decedent's death, Gates thought that given the lack of a market for the Stock and in the absence of other information about its value, it was the only available yardstick for a measurement of value.

103. On August 2, 1995, Tyler, Weir, and Gates met with Johnson to discuss Nyman's offer to redeem the Stock. At the

meeting, Johnson reviewed the financial condition of the Company and promised to submit a detailed written redemption offer by the close of business on August 4.

104. At this point, the Bank internally discussed potential responses to Nyman's anticipated formal offer. Three options were identified: (1) distribute the Stock to the Beneficiaries and let them make the decision; (2) hold on to the Stock and negotiate with Nyman; or (3) "seek the approval and indemnification of all parties to act in tendering our shares for redemption."[12]

105. On August 4, 1995, Nyman formally offered to purchase the Stock from the Estate for $145.36 per share. The offer was conditioned on all Beneficiaries' approval by September 15 and on Nyman's success in obtaining waivers of covenants in its loan agreements that prohibited the repurchase of Nyman stock.[13] The offer letter described the state of the Company and included certain financial data.

---

[12] The Bank also internally discussed hiring outside counsel to represent the Bank because Gates's representation might give rise to a conflict of interest. At this time, Gates was serving simultaneously as co-executor of the Estate, attorney for the Bank in connection with the Roland Burt lawsuit, and co-executor of the estate of June Gilmore, one of the Beneficiaries who had passed away during the administration of the Estate.

[13] Nyman represented that it would not "actively seek" a waiver of the repurchase restrictions until after sixty percent of the Beneficiaries had approved the offer.

106. In a cover letter accompanying the offer materials, Johnson indicated Nyman's expectation, based on the meeting of August 2, that the co-executors would review the information furnished by Nyman and request such other information as they deemed appropriate to adequately evaluate the offer. "The executors will also arrange an informational meeting for the beneficiaries in order to answer any questions or respond to concerns related to the offer in a timely manner." In view of the tight response time, "Nyman expects that the executors will initiate their communication with the beneficiaries by August 11th and will have scheduled an informational meeting during the week of August 21st."

107. On August 10, 1995, the co-executors sent a packet to the Beneficiaries relaying Nyman's offer and a redacted version of Nyman's offer letter and materials. The co-executors stated that they "have reached no conclusions with respect to the proposed offer by Nyman" and asked that each Beneficiary review the information sent by Nyman and make his or her own decision. They gave the Beneficiaries until August 22 to respond, by indicating their approval or disapproval on an enclosed form. Failure to respond by August 22 would count as a disapproval.

108. The Beneficiaries did not receive the packet until August 15 or 16, 1995, effectively giving them a few days to consider the offer and respond.[14]

109. The co-executors did not request any further information or materials from Nyman in connection with Nyman's offer.

110. The co-executors never determined whether they had sufficient information to adequately evaluate Nyman's offer.

111. The co-executors did not perform any independent research in connection with Nyman's offer, did not independently evaluate Nyman's offer, and did not independently investigate the business or financial condition of Nyman.

112. The co-executors never negotiated, nor attempted to negotiate, with Nyman to obtain a higher price or more favorable conditions for the offer.

113. The Bank never formed an opinion as to the value of the Stock in connection with Nyman's offer.

114. The co-executors did not arrange an informational meeting with the Beneficiaries to explain Nyman's offer and answer the Beneficiaries' questions about it.

---

[14] Post office return receipts showing a delivery date of August 15 or 16 exist for all Beneficiaries except Raymond Cyr. Since Raymond Cyr lived in Florida at the time, the Court finds that he did not receive the packet earlier than the other Beneficiaries, who lived in Rhode Island or Massachusetts.

115. On August 11, 1995, Johnson wrote to Tyler that, since Decedent's death, the value of Nyman's real estate had significantly declined, "equivalent to $479.69 per share."

116. On August 16, 1995, David Gilmore, on behalf of the estate of his mother June Gilmore, approved Nyman's offer.

117. On August 17, 1995, Judith Lawton approved Nyman's offer.

118. On August 18, 1995, Beverly Kiepler approved Nyman's offer.

119. On August 18, 1995, Janice Leffingwell approved Nyman's offer on the condition that the Estate would bear no more fees.

120. In a letter to the Beneficiaries dated August 22, 1995, Tyler relayed the information that he had received from Johnson on August 11 regarding the value of Nyman real estate; advised that Nyman, not the Estate, would bear the costs of the proposed transaction; and stated that Nyman had extended the response deadline from August 22 to August 31.[15]

121. In fact, Nyman's response deadline was September 15, 1995. August 22 and August 31 were the co-executors' self-imposed deadlines for the Beneficiaries.

---

[15] Tyler also wrote, "We plan to distribute the proceeds of the proposed transaction once we have obtained an indemnification from the estate beneficiaries. Necessarily, we would also need to reserve sufficient funds for the defense of any pending or planned litigation."

122. On August 24, 1995, Raymond Cyr rejected Nyman's offer, writing, "I want at least $65,000 for my 1/10 no less. I have some interest in it for that." Cyr got the $65,000 figure from a conversation he had had with Tyler in 1989, when he had come to Rhode Island from Florida after the death of his sister. Tyler had told him then that his shares of the Stock were worth "ballpark" around $60,000 – $70,000 depending on the market, and the number had stuck with him.

123. On August 25, 1995, Carol Lincoln rejected Nyman's offer.

124. Some time between August 25 and August 28, 1995, Robert Nyman called Raymond Cyr. They were cousins, and they got talking like cousins do, among other things about Raymond Cyr's boat-building days. Then, Robert Nyman told Raymond Cyr that he should approve the offer, because all other Beneficiaries had approved it, and he was the one person holding up the sale. At this point, Robert Nyman did not know that Raymond Cyr had already rejected the offer, and Raymond Cyr did not tell him.

125. A few days after their initial telephone conversation, Robert Nyman again called Raymond Cyr. This time Robert Nyman had learned (apparently from the Bank) that Raymond Cyr had rejected Nyman's offer, and according to Raymond Cyr, "boy he was hot." He told Raymond Cyr again that he was the only

Beneficiary who had not signed the approval form and was holding up the sale and urged him to sign. Raymond Cyr asked whether certain other Beneficiaries had signed, and Robert Nyman responded that they had. Raymond Cyr told Robert Nyman to send him another form and agreed to sign it.

126. On August 30, 1995, Raymond Cyr approved Nyman's offer.

127. In sum, David Gilmore (as executor of the estate of June Gilmore), Judith Lawton, Beverley Kiepler, Janice Leffingwell, and Raymond Cyr approved Nyman's offer. Beverley Kiepler would subsequently revoke her approval. Carol Lincoln expressly rejected the offer. The remaining Beneficiaries-- Joyce Hendricks, Joan Grant, Roland Burt, Janis Fisher--never formally respond to Nyman's offer, which counted as a rejection.

128. On August 31 and September 7, 1995, respectively, CoreStates Bank and Heller Financial waived any breach of the stock repurchase restrictions in their loan agreements with Nyman arising from Nyman's proposed redemption of the Stock.

129. Not having been accepted by all Beneficiaries, Nyman's offer to repurchase the Stock expired by its terms at 3 p.m. on September 15, 1995.

130. Nyman never renewed its offer to purchase the Stock. However, Nyman representatives did express continued interest in

buying the Stock during subsequent meetings and communications with the co-executors.

131. On September 20, 1995, Weir, Tyler, and Gates met with Johnson and attorney Gary Yesser. (Yesser had joined the Nyman team in communicating with the co-executors about the offer to repurchase the Stock.) The co-executors informed the Nyman representatives of the Beneficiaries' responses to the offer. Yesser was emphatic that Nyman would only purchase the shares of all, not some or most, of the Beneficiaries. Johnson revealed that he had been calling the Beneficiaries to elicit support for the transaction and reported that some of them had expressed concerns. He said that the concerns did not involve price but revolved mostly around perceptions of the Bank's overcharging and lying to the Beneficiaries. Johnson said he believed that these concerns could be resolved and offered to mediate between the co-executors and the Beneficiaries and clarify the offer to the Beneficiaries. Johnson and Yesser also offered to step into the probate court hearings to convince the judge to authorize the sale. Finally, Yesser and Johnson told the co-executors that Nyman was not for sale and that Nyman's management had not discussed and was not contemplating a sale of the Company. They offered to sign a representation and warranty to that effect.

132. The co-executors never took up Nyman on its offer to execute a representation and warranty that Nyman was not for sale and no sale was in contemplation.

133. Gates told the Bank, as he had done before, see supra ¶¶ 100, 102, that he would rather distribute the Stock to the Beneficiaries than sell it to Nyman.

134. Subsequently, the Bank internally discussed the looming offer and the vista before them. Weir believed that the co-executors needed outside counsel to assist them with several issues, including "the risk of involving or appearing to involve Nyman to resolve estate issues or appear to be conspiring against our beneficiaries," and "avoiding a trap by Nyman, i.e. getting a sale done and having the company sold for a significantly higher price within a year or two thereafter, although Gary offered to represent and warrant that the company was not for sale and that no consideration of sale has been or is being discussed."

135. The Bank never engaged outside counsel in connection with Nyman's repurchase offer, nor in connection with the concerns identified by Weir.

136. Pursuant to further internal discussions, including a conference call among Tyler, Weir, and Otto, the Bank decided (as Gates had decided before) that in-kind distribution of the Stock was the course of action that best served the interests of

the Beneficiaries.  This decision was reached no later than September 22, 1995.

137. The Bank subsequently communicated this decision to Gates and asked him to prepare a petition for distribution to present to the probate court.

138. Gates told Nyman that the co-executors would not file a petition for distribution with the probate court unless Nyman paid the fees for drafting and presenting the petition.

139. Gates intended, on behalf of the co-executors, to distribute the Stock without seeking probate court approval in the event that Nyman would not agree to pay the fees associated with the petition.

140. Nyman agreed to pay Gates's fees for drafting and presenting the petition.

141. Nyman asked that the co-executors include information about its offer in the petition.

142. The co-executors allowed Nyman to have input into the content of the petition.

143. On September 28, 1995, the co-executors petitioned the probate court for distribution of the Stock.  The petition sought a distribution upon obtaining a receipt and standard indemnity agreement from the Beneficiaries to indemnify the co-executors for any expenses arising from lawsuits challenging their administration of the Estate.  The petition also described

Nyman's offer to purchase the Stock, stated that six Beneficiaries had accepted the offer, and mentioned that Nyman had expressed continued interest in purchasing the Stock.

144. In fact, only five Beneficiaries had accepted the offer as of that date. See supra ¶ 127.[16]

145. By the next day, the co-executors sent a copy of the petition to the Beneficiaries and informed them of the upcoming probate court hearing on the petition, scheduled for October 19, 1995.

146. Meanwhile, the co-executors kept in contact with Nyman, for example, attending a conference with Johnson on October 17, 1995.

147. On October 18, 1995, Beverley Kiepler, by her husband John Kiepler, revoked her earlier approval of Nyman's repurchase offer, objecting to the indemnification requirement referenced in the co-executors' letter of August 22.[17]

---

[16] The petition for distribution states that, after five Beneficiaries accepted the offer in writing, "one more beneficiary, through her attorney, indicated that she was in favor of such sale." Presumably this refers to Janis Fisher, who at this time briefly engaged Carol Najarian as her attorney in connection with Estate matters. However, since there has been no testimony from Janis Fisher or attorney Najarian to the effect that Janis Fisher ever accepted the offer, and since there is no indication that Janis Fisher ever sent in the approval form, the Court finds that only five Beneficiaries had approved the offer at this time.

[17] John Kiepler testified that the Kieplers had not quite understood the indemnification condition initially, and Tyler

148. Going into the October 19, 1995 probate court hearing, both co-executors believed that an in-kind distribution of the Stock to the Beneficiaries was the course of action that best suited the interests of the Estate and the Beneficiaries.

149. On October 19, 1995, a hearing was held before the probate court.[18] Tyler, Gates, Yesser, Homonoff (Roland Burt's attorney), and Beneficiaries Judith Lawton, Joan Grant, Carol Lincoln, Janice Leffingwell, Joyce Hendricks, Janis Fisher, and Roland Burt were among those in attendance. John Kiepler was present on behalf of Beneficiary Beverly Kiepler. Beneficiaries Raymond Cyr and June Gilmore were not in attendance.[19]

150. Two issues were before the court at this hearing: (1) the amended first account filed by the co-executors on March 6, 1995; (2) the co-executors' petition for distribution.

151. At the probate court hearing, Gates presented the petition by reading from it. Then, Yesser, on behalf of Nyman,

---

did not respond to a call from John Kiepler on August 17, seeking clarification on this point.

[18] There is no official transcript or record of what transpired at the October 19 probate court hearing. The Court's findings on this score are based on carefully weighing the trial testimony of various witnesses who were present at the hearing and reviewing contemporaneous documents recording the recollections of various participants in the hearing.

[19] June Gilmore was no longer alive at this time. David Gilmore, her son and the co-executor of her estate, did not attend because Gates was present as the other co-executor of her estate.

gave a speech urging the sale of the Stock to the Beneficiaries, pursuant to the terms of Nyman's previous offer, presenting it as a great deal for the Beneficiaries. Even though the co-executors continued to believe that distribution best served the Beneficiaries' interest, they did not renew their request for a distribution, did not contradict Yesser's pitch for a sale of the Stock, and did not in any way respond to Yesser's comments. Under the circumstances, in view of the co-executors' perfunctory presentation of the petition, coupled with their utter passivity in the face of a forceful argument in support of a course of action directly contradicting the petition, it would have been reasonable for the probate court to interpret the co-executors' conduct as a whole during the hearing as favoring the sale or at least as an attitude of equal preference between the outcomes of sale and distribution. This was not, in fact, the attitude of the co-executors. Rather, they continued to believe that distribution best served the Beneficiaries' interest.

152. At the probate court hearing, Carol Lincoln and Joan Grant attempted to voice their concerns and objections with respect to the sale of their shares of the Stock without their consent. The probate court would not hear them out.

153. After Gates and Yesser had made their presentations, the probate court (1) allowed the amended first account and (2) ordered the sale of the Stock to Nyman at $145.36 per share.

The probate court ordered that the co-executors distribute $5,000 from the proceeds of the sale to each Beneficiary and remit the balance ($277,932) to the probate court registry for deposit into an escrow account.[20]  The proceeds in escrow were to be distributed upon the court's order (to be entered when it had determined that all outstanding issues regarding the Estate had been resolved).  The court directed the co-executors to prepare an order setting forth these rulings for the court to sign.

154. The co-executors did not appeal the probate court's order or move for its reconsideration.

155. The co-executors did not advise the Beneficiaries of their right to appeal the probate court's order.  See infra at 94.

156. The day after the probate court hearing, Tyler noted, in a memorandum to his colleagues at the Bank, that Roland Burt's suit was still pending in the Superior Court.  He wrote, "It is hoped that the delay in distributing the balance of the escrowed proceeds from the stock sale will serve as leverage in bringing the Superior Court action to resolution."

---

[20] The probate court initially intended to send all proceeds to the probate court registry but agreed to distribute $5,000 to each Beneficiary at Marvin Homonoff's request.

157. On the day following the probate court hearing, Judith Lawton wrote a letter pleading with Roland Burt to drop his lawsuit as its expenses would come out of the Estate.

158. On October 24, 1995, Yesser urged Gates to expeditiously prepare a draft order setting forth the probate court's rulings on October 19 and to share the draft order with him. "Given the high degree of acrimony regarding the beneficiaries, I do think that the closing should be expedited . . . ." Gates complied. Yesser reviewed the draft order and said he had "no objection to it immediately being filed."

159. On October 25, 1995, Gates filed a proposed order for the probate court to sign.

160. On November 2, 1995, Judith Lawton again pleaded with Roland Burt to drop his lawsuit so that the Estate could be closed.

161. On November 2,[21] 1995, the probate court entered an order approving the amended first account and ordering the sale of the Stock to Nyman at $145.36 per share.

---

[21] The only copy of the probate court's order on file with this Court (Ex. 318) has a dateline that is difficult to read but most certainly does not show November 2. It probably shows November 3 or November 8. However, both parties have represented that the order was signed on November 2, and contemporaneous documents reflect the actors' supposition at the time that the order was entered on November 2. As the issue is undisputed, the Court finds that the order was entered on

162. The probate court's rulings could be appealed by any interested party within twenty days.

163. On November 6, 1995, the co-executors and Nyman closed the sale of the Stock in escrow, with Yesser acting as escrow agent.

164. The next day, Pearlman advised Gates that he would be reentering the scene as Ronald Burt's counsel and demanded $150,000 in settlement of his client's claims. He insisted on an answer by the following day. Gates relayed the information to Yesser. Subsequent inquiry revealed that Pearlman had been reinstated to the Rhode Island bar.

165. On November 8, 1995, Yesser, as escrow agent, established an escrow account to hold the $327,932 in undistributed proceeds from the sale of the Stock.

166. On November 21, 1995, Judith Lawton wrote to her fellow Beneficiaries, expressing concerns over how the continuation of Roland Burt's lawsuit was harming them all. She was particularly worried that the expenses of defending the suit would come out of the Estate.

167. At this point, Nyman, probably via Johnson, had relayed the information regarding Pearlman's recent reinstatement to the bar and Roland Burt's continued prosecution

_____

November 2. Whether it was November 2 or 3 or some other nearby date makes no difference for our purposes.

of his lawsuit to Judith Lawton. When she agitated for the settlement of Roland Burt's suit in October-November 1995, Judith Lawton was under Johnson's influence and believed that Nyman had done the Beneficiaries a favor by repurchasing the Stock (an attitude that later changed dramatically). See supra at 23 n.11. She continued to find fault with the Bank for delaying the administration of the Estate for so long, but her misgivings on the subject were tempered by her sense that she had gotten a very good deal in the sale of Stock to Nyman.

168. In late November 1995, after ascertaining that no appeal had been taken from the order of the probate court, Yesser sent $50,000 of the sale proceeds to the co-executors (who subsequently forwarded them to the Beneficiaries) and sent the balance of $277,932 to be deposited in the probate registry.

169. On December 4, 1995, Judith Lawton wrote to Gates that she wanted her share of the proceeds held in escrow. She said that she was prepared to sign an agreement to reimburse the Estate for any subsequently arising taxes or expenses in exchange for her share of the proceeds. She closed by requesting that Gates seek the probate court's permission to distribute the funds held in escrow to each Beneficiary willing to sign a receipt and indemnification agreement.

170. The co-executors did not act on Judith Lawton's request.

171. On December 11, 1995, Gates sent Yesser a bill in the amount of $3,940 for legal work performed by Gates "in connection with the offer of Nyman manufacturing Co. to buy back 2,256 shares of the Class A Common Stock owned by the Estate."

172. Nyman paid Gates's bill.

173. On December 14, 1995, Raymond Cyr wrote to Roland Burt, copying Judith Lawton and the Bank, and implored him to drop his lawsuit:

> Roland, the only people that make money out of this kind of case are the attorneys . . . . I do not think it is fair on your part to hold the distribution of fund[s] to the beneficiaries, who could use these funds . . . . I have to admit, I wish they had sent me my share of the stocks instead of selling it as she did have some good ones.  I am not happy with the way it turned out, but I do not see the sense in going any further.

174. On January 10, 1996, the Bank engaged Steven E. Snow of Partridge Snow & Hahn LLP to represent it in the Roland Burt suit.

175. Snow continues to represent the Bank in the present litigation.

176. On January 23, 1996, Nyman offered to purchase the shares of Stock held in the Walfred Nyman Trust for $145.36 (the same price as it had paid for the shares of Stock in the Estate).

177. The Bank, as trustee of the Walfred Nyman Trust, responded that, "in order for us to perform our fiduciary

responsibility in reviewing this transaction," it needed further information--specifically, the most recent interim financial statements, Nyman's bylaws, and the name of an individual at Nyman who would be able to address questions regarding Nyman's operations and financial statements.

178. In subsequent internal communications regarding Nyman's offer to purchase the Walfred Nyman Trust shares, Weir indicated that Johnson of Nyman "is concerned about any buyout at a price different from the Magda Burt Estate, but I believe that is not our problem. We need to address the situation based on the information we have."

179. Subsequently, officers at the Bank put substantial effort into evaluating the desirability of Nyman's offer to purchase the Walfred Nyman Trust shares, which by far exceeded their efforts in connection with Nyman's offer to purchase the Stock from the Estate.[22]

180. At the end, Beverly Kiepler, who was a beneficiary of the Walfred Nyman Trust, as well as a Beneficiary of the Estate,

---

[22] The response of the Bank as trustee of the Walfred Nyman Trust to Nyman's offer to purchase the Stock held in that Trust was not a focus of this trial, and some of the exhibits evidencing this response were not admitted as full exhibits. Thus, it is unclear to the Court how much of this information is properly in the record of this case. Accordingly, the Court does not rely on ¶¶ 177-79 in reaching any of its conclusions in this case. The results would be no different if these paragraphs were simply excised.

objected to Nyman's offer to buy the shares held by the Trust. Given the objection, the Bank as trustee rejected the offer.

181. On March 19, 1996, pursuant to a petition filed <u>pro se</u> by Judith Lawton, the probate court authorized the release of an additional $125,000 from the Stock sale proceeds to the Estate.

182. Pursuant to this authorization, Tyler sent a check for $12,500 to each Beneficiary on March 26, 1996.

183. The remaining funds from the sale of the Stock to Nyman are still held in the probate court registry.

184. On March 28, 1996, Judith Lawton wrote to Roland Burt again, urging him to drop his lawsuit so that the Estate could be closed. She cautioned him that he would not prevail in the suit and that the expenses of it would come out of the Estate.[23]

185. In May 1996, Nyman offered to redeem all outstanding shares of the Stock held individually or as part of the Walfred Nyman Trust by Beverly Kiepler and Judith Lawton (as well as other family members) for $200 per share.

186. Beverly Kiepler rejected the offer, stating that, as long as her brothers (Robert and Kenneth Nyman, both executives at Nyman) were keeping their Stock, she would keep hers too.

---

[23] The letter also referenced a prior request by Roland Burt for each Beneficiary to pay Pearlman $135 so that he could retrieve $5,000 from the probate court registry. Judith Lawton stated that obtaining a distribution was so easy that, acting <u>pro se</u>, she could obtain more than twice the amount promised by Pearlman and that the payment to Pearlman was therefore "not necessary."

She kept her shares of the Stock until September 1997, when she sold them to Van Leer (see infra ¶¶ 189-190).

187. Judith Lawton accepted the offer and sold her remaining shares of the Stock to Nyman for $200 per share on May 30, 1996.

188. In August 1996, Keith Johnson and Robert Nyman met with the consulting firm Shields & Company, Inc. to discuss, among other things, a potential sale of Nyman.

189. On September 29, 1997, after a series of meetings and negotiations, Nyman was sold to Royal Packaging Industries Van Leer N.V. ("Van Leer"), a Dutch corporation.

190. Holders of Class A non-voting common stock of Nyman received $1,667.38 per share in the sale to Van Leer.

191. After the Van Leer sale, Judith Lawton and Beverly Kiepler separately sued Nyman executives for fraud and breach of fiduciary duties.

192. On January 17, 2002, Judge Ernest Torres of this Court issued a decision in Kiepler v. Nyman, CA No. 98-272-T, 2002 U.S. Dist. LEXIS 19630 (D.R.I. Jan. 17, 2002). In this suit, Beverly Kiepler and her daughter alleged that Johnson and Robert and Kenneth Nyman breached their fiduciary duties as directors and officers of Nyman by awarding themselves options to purchase Nyman stock and by purchasing shares of treasury stock for amounts less than fair value, thereby unjustly enriching

themselves, diluting the plaintiffs' interest in the Company, and diminishing the amount the plaintiffs received when the Company was sold to Van Leer. After a bench trial, Judge Torres found for plaintiffs and awarded them $573,443.53, plus interest, in damages. Defendants subsequently appealed, and the parties settled. According to John Kiepler's testimony at the trial of the present case, by the combined amount of this settlement and Beverly Kiepler's sales of her shares to Van Leer, Beverly Kiepler received around $2,400 to $2,500 for each share of Nyman Class A stock that she held (other than those in the Estate).

193. On January 17, 2002, Judge Torres issued a decision in Lawton v. Nyman, CA No. 98-288-T, 2002 U.S. Dist. LEXIS 17398 (D.R.I. Jan. 17, 2002). In this suit, Judith Lawton and members of her family brought claims for fraud and breach of fiduciary duty against Nyman, Robert and Kenneth Nyman, and Johnson, claiming that they induced her to sell her shares to Nyman for less than fair value by fraudulently concealing plans for the imminent sale of Nyman for a much higher price. After a bench trial, Judge Torres found for plaintiffs, awarding them $2,096,798.48, plus interest. On appeal, the First Circuit affirmed Judge Torres's finding of liability but remanded for further proceedings on damages. Lawton v. Nyman, 327 F.3d 30 (1st Cir. 2003). On remand, Judge Torres made further findings

of fact and determined that, depending on the First Circuit's determination on the proper measure of damages, plaintiffs shall recover either $2,081,043.44, plus interest, or $2,176,833.68, plus interest. <u>Lawton v. Nyman</u>, 357 F. Supp. 2d 428 (D.R.I. 2005). The parties subsequently settled the suit. According to Judith Lawton's testimony at the trial of the present case and a check shown by her attorney, the amount of the settlement was $3,544,500.

194. It is unclear what ultimately came of Roland Burt's lawsuit. The Bank states, without referencing any evidence in the record, that the suit was dismissed with prejudice by stipulation but does not state whether there was a settlement. It is unclear whether Roland Burt recovered anything.

195. On October 13, 2005, Gates resigned as co-executor.

196. The Bank still serves as executor of the Estate.

197. The Estate is still open.

II. CONCLUSIONS OF LAW

A.   The Legal Standard

Technically, this is a suit on a bond. But, as the parties recognize, once this layer of formalism is stripped away, the heart of the complaint is the claim that the Bank breached its fiduciary duties to the Beneficiaries. To prevail on this claim, Plaintiffs must show that the Bank owed them a fiduciary duty, that it breached this fiduciary duty, and that this breach

was the actual and proximate cause of harm suffered by them. See Chain Store Maint., Inc. v. Nat'l Glass & Gate Serv., Inc., No. Civ.A. PB 01-3522, 2004 WL 877599, at *13 (R.I. Super. Apr. 21, 2004); see also Giron v. Bailey, 985 A.2d 1003, 1007 (R.I. 2009) (stating the same elements for all civil negligence actions).[24]   An executor owes a fiduciary duty to the beneficiaries under a will, like the duty owed by a trustee to a cestui que trust.   Estate of Wickes v. Stein, 266 A.2d 911, 914 (R.I. 1970).   This fiduciary duty requires that the executor act at all times in the best interests of the beneficiaries as a whole, and more specifically encompasses duties to act in utmost good faith, Hendrick v. Hendrick, 755 A.2d 784, 789 (R.I. 2000), to act with undivided loyalty to the beneficiaries, Sinclair v. Ind. Nat'l Bank of Providence, 153 A.2d 547, 551-52 (R.I. 1959), and to avoid self-dealing and conflicts of interest, id. at 552. See generally George Gleason Bogert et al., The Law of Trusts and Trustees §§ 541-544 (2d ed. revised 1993) (enumerating and elaborating the duties of trustees).

Further, an executor is duty-bound to discharge the affairs of a beneficiary as a prudent person would discharge his own affairs.   Donato v. BankBoston, N.A., 110 F. Supp. 2d 42, 48

---

[24] Both parties cite A. Teixeira & Co. v. Teixeira, 699 A.2d 1383, 1387-88 (R.I. 1997), for the elements of a breach of fiduciary duty claim.   That decision plainly does not set forth such elements.   The proposition is too elementary to detain the Court.

(D.R.I. 2000) ("Trustees must be prudent and vigilant and exercise a sound judgment. They are to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income as well as probable safety of the capital to be invested.") (citations and quotations omitted); see also R.I. Gen. Laws §§ 18-15-1 to 18-15-13 (codifying the common law prudent investor rule for trustees). Embedded in the duty to act prudently and reasonably is the duty to wind up the estate promptly and efficiently, and the Rhode Island Supreme Court has recognized the desirability of this. See Ranalli v. Edwards, 202 A.2d 516, 519 (R.I. 1964) ("It is in the public interest that the estates of decedents be promptly settled and that the property rights of heirs-at-law be fixed."). A failure to exercise such reasonable care and due diligence as would be expected of a prudent person gives rise to a breach of fiduciary duty, even if no bad faith is involved. Oscar A. Samos, M.D., Inc. v. Dean Witter Reynolds, Inc., 772 F. Supp. 715, 719 (D.R.I. 1991) ("Trust law does not require bad faith; rather, a trustee commits a breach of trust when he 'intentionally or negligently do[es] what he ought not to do or fail[s] to do what he ought to do.'") (quoting Restatement (Second) of Trusts § 201 cmt. A (1959)).

This much is well-settled, black letter law and, despite somewhat different phrasings, the parties do not essentially dispute any of it. The only real dispute as to the applicable legal standard is whether the Bank should be held to a higher standard of care than the traditional prudent person standard because of its institutional sophistication. Plaintiffs say it should; the Bank says it should not. This dispute is immaterial, because the Court's findings on whether particular instances of alleged misconduct amounted to breaches of fiduciary duty would not change depending on whether the standard is the traditional prudent person standard or a higher standard. This is true both of the findings that there was no breach and of the findings that there was a breach. Accordingly, the Court does not rule on whether the Bank's institutional sophistication requires the imposition of a higher standard of care.

B.  Plaintiffs' Claims

Plaintiffs have alleged that a wide variety of the co-executors' actions[25] amounted to breaches of fiduciary duties-- such a wide variety, indeed, that merely listing them takes five

---

[25] Gates is not a defendant in this action, and most of the Plaintiffs' claims are directed at the Bank's actions or inactions. The Bank, in turn, has not attempted to shift any blame to Gates. In any event, the Bank seems to be jointly and severally liable on Gates's bond. (See Ex. 296, Bond.) For all these reasons, there is no occasion to apportion blame between the two co-executors.

single-spaced pages.  (See Pls.' Post-Trial Br. 72-76; see also Compl. ECF No. 20.)  At bottom, though, the alleged breaches of duty fall into five broad categories, each with similar operative facts.  The first category consists of the claim that the co-executors unduly delayed the closing of the Estate and the distribution of the Stock.  The second category comprises breaches of duty allegedly arising from the October 19, 1995 probate court hearing, namely failing to properly advocate for distribution at the hearing and failing to respond to attorney Gary Yesser's pitch for a sale; failing to appeal the probate court's order to sell the Stock; and failing to apprise the Beneficiaries of their right to appeal the probate court's order to sell the Stock.  The third category relates to the co-executors' handling of Nyman's offer to buy the Stock, including alleged failures to independently evaluate the Stock, to check Nyman's numbers, to assess the adequacy of Nyman's offer, to determine whether Nyman had provided sufficient information to enable an intelligent decision on its offer, to gather and transmit to the Beneficiaries sufficient information to enable an intelligent decision on Nyman's offer, and to inform the Beneficiaries of any of the foregoing, as well as the failure to negotiate the purchase price and other terms of the offer with Nyman.  The fourth category of claims covers alleged conflicts of interest arising from permitting Nyman to pay Gates's bill

for petitioning the probate court, allowing Nyman to have input into the content of the petition, and maintaining an interest in the Stock to offset expenses arising from Roland Burt's suit. The fifth and final category concerns allegations of overcharging the Estate and permitting excessive fees.

The Court will now turn to assessing the merits of each category of claims. The first step of the analysis is to decide, as to each category of claims, whether the Bank breached its fiduciary duty.[26] Then, for the claims as to which the breach question is answered in the affirmative, the analysis proceeds to whether and to what extent the Beneficiaries suffered harm as an actual and proximate result of the Bank's breach.

C.   Delay in Closing the Estate

The relevant time period for the purpose of assessing the delay claim is from October 8, 1987, when the Will was admitted to probate and the co-executors appointed, to October 19, 1995, when the probate court ordered the sale of the Stock.  As early as February 28, 1990, when most if not all of the assets in the Estate (except for the Stock and some cash) had been disposed of and the tax issues arising from the IRS audit had been resolved, Tyler wrote to the Beneficiaries that an accounting will be

_____

[26] The Bank concedes that it had a fiduciary duty to the Beneficiaries.  (Def.'s Post-Trial Br. 76.)

filed with the probate court soon.  Facts ¶ 18.  As chronicled in great detail in the above Findings of Fact, Tyler repeated this same promise over the course of years, in the face of numerous inquiries by Gates and the Beneficiaries.  In spite of these many promises, no accounting was filed with the probate court until March 6, 1995, and it was not approved until October of the same year.  It is beyond dispute that, ordinarily, closing an estate of the magnitude of Decedent's does not take eight years, and taking that long to close it would ordinarily constitute undue delay.

But this was no ordinary case, says the Bank, and it offers various extenuating circumstances that it claims justified the delay in closing the Estate.  The Bank's principal justifications are these:  First, Clause Tenth of the Will directed a sale of Stock to Nyman and permitted no distribution without probate court approval.  Second, Roland Burt's lawsuit consumed the co-executors and delayed the closing of the Estate.  The lawsuit also made the co-executors leery of distributing the Stock without indemnification agreements because, being the last significant asset remaining in the Estate, the Stock was needed to pay the expenses arising from the litigation.  Third, the Beneficiaries would not sign the required indemnification, or even a receipt and release form, so that the Stock could be distributed to them.  The Bank also points to a number of

ancillary justifications which it pursues with minimal vigor--namely the tax audit, the replacement of worthless and obsolete securities in the Estate, and Nyman's inability to redeem the Stock. (See Def.'s Post-Trial Br. 17, 22, 64, 85, 94-95 et passim (justifying the delay).) The Court will analyze these proffered justifications in turn.

i. Clause Tenth of the Will

Clause Tenth of the Will provides, in pertinent part:

> If I am the owner of any stock in the Nyman Manufacturing Company at the time of my death, I hereby direct my executors to offer all such stock to said Nyman Manufacturing Company for sale at the lowest price for which they are willing to sell it and to make no sale at any lower price without first offering such stock to said company, this same condition to be imposed upon my trustees if such stock becomes an asset of any trust.
>
> I hereby authorize my said executors to sell any other property not specifically devised or bequeathed hereunder for such prices and on such terms as they deem advisable in order to facilitate the administration of my estate without the necessity of obtaining the approval of the Probate Court so to do.

(Ex. 295, Last Will and Testament of Magda Burt.)

The parties do not dispute that this provision gave Nyman a right of first refusal in the Stock.[27] But the Bank goes further than that. It claims that the clause not only gave Nyman a

---

[27] A right of first refusal refers to "[a] potential buyer's . . . right to meet the terms of a third party's higher offer. For example, if Beth has a right of first refusal on the purchase of Sam's house, and if Terry offers to buy the house for $300,000, then Beth can match this offer and prevent Terry from buying it." Black's Law Dictionary (9th ed. 2009).

right of first refusal in the event the co-executors decided to sell the Stock, it also "required the executors to sell the stock to the company at a bargain price." (Def.'s Post-Trial Br. 61.) Further, the Bank claims that the second paragraph quoted above prohibits the distribution of the Stock without probate court approval. (See id. at 7, 32, 61, 80-82, 90, 94 et passim.)

The Bank's interpretation of Clause Tenth must be analyzed on three levels. First, on a factual level, the parties dispute whether the co-executors actually believed in this interpretation of Clause Tenth when they were administering the Estate or whether this is an ex post facto justification for delay concocted by the Bank for the purposes of this litigation. Secondly, the parties dispute whether the Bank's interpretation of Clause Tenth is correct as a matter of legal construction. Finally, even if the Bank actually believed in this interpretation of Clause Tenth at the time, and even if the interpretation is legally correct, it remains to be seen whether it could have justifiably delayed the distribution of the Stock for so long. The Court will address these issues in turn.

First, there is no evidence--except for Tyler's self-serving testimony at trial--that, in the relevant time period of October 1987 to October 1995, the co-executors shared the understanding of Clause Tenth now put forth by the Bank. All

contemporaneous evidence--which, for obvious reasons, is more credible than the self-serving trial testimony of a party-- indicates the contrary. There is no evidence that the co-executors ever told the Beneficiaries that they were obligated to sell the Stock to Nyman and that it was this obligation that prevented them from petitioning the probate court to distribute the Stock, nor did Tyler ever relay the same to Gates. As detailed in the Findings of Fact, the Bank received a great number of written and telephonic communications, some of them quite sharply worded, from the Beneficiaries and Gates asking why it was taking it so long to file an accounting, distribute the Stock, and close the Estate. In the face of this barrage of communications, if the Bank actually believed that Clause Tenth of the Will had anything to do with the delay, it is natural to expect that it would have said so. It did not, not even once. Rather, in contemporaneous communications with the Beneficiaries, Tyler referred to Clause Tenth as a "right of first refusal" and did not set forth the Bank's currently proffered interpretation. (See, e.g., Ex. 44, letter dated Jan. 18, 1991 from Tyler to John Kiepler, cc to Gates; Ex. 122, letter dated Mar. 25, 1994 from Tyler to Raymond Cyr, cc to Gates.)

The first contemporaneous reference to an interpretation of Clause Tenth that somewhat resembles the interpretation

currently proffered by the Bank is found at the tail end of the eight-year period of delay--that is, in Jeremy Weir's email following the meeting with Nyman officials on September 20, 1995. Even then, Weir did not say anything about an obligation to sell "at a bargain price" or at a low price; rather, he said that Clause Tenth directs a sale "at the lowest acceptable offer, but not at any lower price," and that "clearly our direction under the instrument was not to hold but to sell." (Ex. 222; see also Facts ¶¶ 131-134.)  In short, the preponderance of the evidence is that, in the relevant time period, the co-executors did not harbor the understanding of Clause Tenth now advanced by the Bank and did not perceive of Clause Tenth as creating any duties that would delay the closing of the Estate.[28]

As for the legal question, the Bank's interpretation of Clause Tenth has three components:  first, that Clause Tenth obligated the co-executors to sell the Stock to Nyman; second, that Clause Tenth obligated the co-executors to accept a bargain price for the Stock; and third, that Clause Tenth required the

---

[28] Clearly, this is a finding of fact.  The Court did its best to confine fact findings to the Facts section, but certain factual questions arise only in the context of the legal theories advanced by the parties and to discuss them prior to discussing the legal background would have made the opinion incoherent.  Therefore, unavoidably, findings of fact will prop up in the Conclusions of Law section, especially in the discussion of damages below.  These should be considered findings of fact.

approval of the probate court before the Stock could be distributed. In assessing these interpretations, the Court is guided by familiar principles of textual interpretation--that the purpose of interpreting a will is to ascertain the testator's intent, Industrial Trust Co. v. Flynn, 60 A.2d 851, 857 (R.I. 1948), that the words of a will are to be given their ordinary meanings, Bliven v. Borden, 185 A. 239, 242 (R.I. 1936), that the testator's intent "must be gathered from the will or clause as a whole, and not from any single expression apart from the context," id., that interpretations which lead to absurdities must be avoided, Hadley Falls Trust Co. v. Green, 59 A.2d 356, 359 (R.I. 1948), and that interpretations which accord with common sense and reason are preferred, Egavian v. Egavian, 232 A.2d 789, 793 (R.I. 1967).

The interpretation that Clause Tenth obligated the co-executors to sell the Stock to Nyman must be rejected based on the clear text of the provision, as well as logic and common sense. Textually, Clause Tenth nowhere directs a sale; rather, it directs an offer to sell. This obviously makes sense, as a sale is a transaction that requires the approval of two parties, buyer and seller, and cannot be accomplished by simply directing the potential seller to do it.[29] At most, Clause Tenth could

---

[29] Obviously, the Will had no power to compel Nyman to accept the co-executors' offer, nor did it purport to do so.

have required the co-executors to _offer_ the Stock to Nyman.[30]
This they did twice--once early in the administration of the
Estate and the second time in August 1993 (Facts ¶¶ 16, 61-62)--
and Nyman rejected the offer both times. There is nothing in
Clause Tenth that compels the co-executors to renew their offers
_ad infinitum_ in the face of rejections. Nor did the co-
executors believe so, as proven by the fact that they did not
plan to offer the Stock to Nyman a second time and did so only
after Roland Burt insisted on it. _See_ Facts ¶ 60. The co-
executors could have and should have attempted to distribute the
Stock when Nyman rejected the first offer or, at the latest,
after it rejected the second offer. Thus, the first component
of the Bank's interpretation of Clause Tenth--that it obligated
the co-executors to sell the Stock to Nyman--is easily rejected.

The second question of legal interpretation is the price at
which the sale, if any, was to occur. The Bank's "bargain
price" theory finds its origin in Clause Tenth's command to
offer the Stock to Nyman "for sale <u>at the lowest price for which</u>
<u>they are willing to sell it</u> and to make no sale at any lower

---

[30] It is not clear that Clause Tenth went even that far.
There is at least a strong argument that Clause Tenth expresses
no preference as between a sale and a distribution in kind of
the Stock; all it says is that, in the event the co-executors
decide to sell the Stock, they should give preferential
treatment to Nyman. The Court need not rule on this argument
because, as explained above, even if Clause Tenth did direct an
offer, it would not help the co-executors.

price without first offering such stock to said company"
(emphasis added).   The Will nowhere specifies how the co-
executors should determine "the lowest price for which they are
willing to sell" the Stock.   How, then, are the co-executors to
arrive at the lowest acceptable price?   The answer that comes to
mind, in light of an executor's duty to act in the best
interests of the beneficiaries, see supra Part II.A, is that the
lowest price that should be acceptable to an executor trying to
sell an asset of the estate should be the highest price he can
get for it.   Indeed, Gates admitted to the same understanding of
the phrase "the lowest price for which they are willing to sell"
on questioning from the Court:

> The Court:  So if I understand it correctly then, if
> someone had offered you $500 per share for all of the
> outstanding stock in the Magda Burt estate as of let's
> say 1991, is it fair to say that you would have felt
> that your obligation was to offer the stock to Nyman
> at that price and then if they were unwilling to
> purchase it at that price --
>
> Gates:  If I knew that there was another buyer at that
> increased price, I would want to receive that amount
> [] from Nyman, too.
>
> The Court:  If someone offered you $500 a share, that
> would be the lowest price that you would be willing to
> sell it for?
>
> Gates:  If I received an offer for 500, yeah, that
> would have changed my mind from the estate tax
> valuation [of $383.04 per share, as adjusted by the
> IRS audit to $403.35 per share].
>
> The Court:  All right.  So your view about the lowest
> price at which you were willing to sell it, that

sounds to me like you believed that that was whatever the fair market value of the stock was, that's what the lowest price was in your mind.

Gates:  Yes.  Yes.

The Court:  Okay.  And it sounds like the only reference you had was the estate tax valuation, which was $383, but if somebody offered you more --

Gates:  That would be it.

The Court:  That would be it, right.

Gates:  <u>I wouldn't sell below a price that someone else was willing to pay for it.</u>

(Trial Tr. 22-23, Nov. 1, 2010 (emphasis added).)[31]

The Bank, however, opposes its co-executor's understanding of "the lowest price for which they are willing to sell."  It argues that, if Decedent had intended the lowest acceptable price to mean the highest attainable price or fair market value, she could have easily specified same in her will.  The problem with this argument is that it applies with equal vigor to defeat the Bank's construction of the phrase:  if Decedent had intended "the lowest price for which they are willing to sell" to mean a bargain price or a low price, she could have easily specified as much in her will.  The point is that the Will did <u>not</u> specify a

_____

[31] Gates also testified that, because there were no outstanding offers and no public market for the Stock, the only yardstick for the co-executors to determine "the lowest price for which they are willing to sell" the Stock to Nyman would have been the price established by the Bank's internal valuation as adjusted by the IRS audit--that is, $403.35 per share--and the co-executors should not have agreed to a price lower than that.  (Trial Tr. 20-21, Nov. 1, 2010; <u>see also</u> Facts ¶ 102.)

method for arriving at this lowest acceptable price, and the Court's task, in the absence of such specification, is to determine a principled way to arrive at it.

The Bank claims that Nyman was a family business founded by Decedent's father, that Decedent had worked at the Company for a while, and that Decedent had some emotional attachment to it, such that she did not want the Stock sold at a price that would stiff Nyman. This is all fine and well, except that it is based on speculation and intuition rather than anything actually stated in the Will. Moreover, it applies just as well to Decedent's relationship with the Beneficiaries: they were all family members, they were close, and they had emotional attachments. If Nyman was a family business, the Beneficiaries were family itself. More importantly, the co-executors owed a fiduciary duty to the Beneficiaries, not to Nyman.

Of course, the co-executors also had a duty to carry out the terms of the Will, even if it did not maximize value to the Beneficiaries.[32] But the problem here is to figure out what Decedent meant by her words in the Will, and it sheds little light to say Decedent's intent is what Decedent intended, as the Bank said in response to the Court's questioning:

---

[32] Accordingly, if the Will had provided say that the co-executors shall sell the Stock for a nickel a share and remit the proceeds to the Beneficiaries, the co-executors would have been obliged to do so, even if Nyman were willing to pay more for it. Obviously, the Will did not so provide.

The Court:  Okay.  What I want to focus on is that language in the clause, "At the lowest price the executors are willing to sell it."  Tell me what you think that means and how you viewed that clause.

Tyler:  The way in which I viewed that clause is that it is not an offering at the highest value attainable in a perfect world, nor is it the fair market value of the stock, but it is a value that all things relevant being considered would enable the transaction to go through to carry out the testator's intent.
    For example, it appeared to us that having been a life-long employee of this family company that there was a preference stated that Magda Burt wanted the shares to go to the company if those conditions were met.  And here we had an offer that, after many years of having little or no marketability, appeared to be a viable offer based on a formula that could be used to be representative of the value of the corporation, understandable, and given the history of the corporation, reasonable.  And therefore, it might not have been the absolute book value, for example, of $182, but it represented a reasonable and, therefore, lower value that would be or could be acceptable to fulfill that clause.  So that's how we interpreted the lowest value that we were willing to sell.

(Trial Tr. 9-10, Oct. 28, 2010.)

Tyler's response is ipse dixit--"this is what Clause Tenth means because we say so."  Moreover, the problem with saying that "the lowest price for which they were willing to sell" means a "reasonable" price, or a price that would not stiff Nyman, is that these terms have no ascertainable meaning.  Does a "reasonable" price mean book value?  Twenty percent off book value?  Carrying value for estate tax purposes?  A price that lets one sleep comfortably at night?  There is just no way to tell, no standard.  By contrast, interpreting "the lowest price

for which they were willing to sell" to mean the highest attainable price leaves the Court with a meaningful standard of measurement: if the co-executors did their due diligence, analyzed Nyman's business, engaged in hard-nosed negotiations, and got the best offer they could, they have met the standard. Moreover, as mentioned, interpreting "the lowest price for which they were willing to sell" to mean the highest attainable price is sensitive to the co-executors' fiduciary duty to the Beneficiaries, whereas the Bank's alternative interpretation ignores this duty.

Last but not least, it is not uncommon for statutes, corporate articles or bylaws, or courts to phrase a right of first refusal in terms similar to "the lowest price for which they were willing to sell." See State Dep't of Transp. v. Providence & Worcester R.R. Co., 674 A.2d 1239, 1241 (R.I. 1996) ("All rail properties within the state offered for sale by any railway corporation after April 9, 1976 shall be offered for sale to the state in the first instance at the lowest price at which the railway corporation is willing to sell." (internal citation omitted)); Ireland v. Globe Milling & Reduction Co., 38 A. 116, 117 (R.I. 1897) ("[T]he main question . . . is whether the alleged agreements had the effect to bind the plaintiff's vendor . . . to offer the stock in question to the defendant corporation at the lowest price at which he was willing to sell,

before selling said stock to the plaintiff."); <u>Sweetland v.</u> <u>Quidnick Co.</u>, 11 R.I. 328, 328 (1876) ("[N]o stockholder in said corporation shall have the right to transfer his shares therein, without first giving ten days' notice in writing of such intention, and ten days' refusal thereof to said corporation, at the lowest price at which he will sell to any other person.").

As between an interpretation that imposes an amorphous standard and is insensitive to the co-executors' fiduciary duty to the Beneficiaries, and an interpretation that provides for an ascertainable criterion, respects the co-executors' fiduciary duty to the Beneficiaries, and is in accord with a common way of phrasing a right of first refusal, the Court has no difficulty in choosing the latter. The "lowest price for which they were willing to sell" the Stock means the highest price that the co-executors, in the exercise of due diligence, could get for it.[33]

---

[33] Another argument--which the Bank does not articulate but which the Court will address in the interest of completeness--is that Decedent would not have bothered drafting Clause Tenth merely as a right of first refusal because such a right was already enshrined in Article Ninth of Nyman's Articles of Association and Article IV, Section 4 of Nyman's Bylaws. (<u>See</u> Exs. 339, 341, Articles of Association of Nyman Mfg. Co.; Ex. 342, Bylaws of Nyman Mfg. Co.) This argument is not convincing because there is nothing illogical or unusual about reinforcing a right in a will even though it might have also been provided for elsewhere. Decedent may not have been aware of or paid attention to these corporate provisions at the time she drafted her Will; may not have been sure that the co-executors would be aware of them or pay attention to them in administering her Estate; or may have intended Clause Tenth as a belt-and-suspenders provision, an added measure of assurance to keep the

The final component of the Bank's interpretation of Clause
Tenth is that, by "authoriz[ing] [her] executors to sell any
<u>other</u> property not specifically devised or bequeathed hereunder
. . . without the necessity of obtaining the approval of the
Probate Court," Decedent effectively prohibited them from
distributing the Stock without probate court approval.  However,
this sentence speaks only of a sale, not a distribution in kind,
so the most that can be read into it is that a <u>sale</u> of the Stock
would have required probate court approval.   In other words,
even if, for the sake of argument, the Court were to accept the
Bank's <u>expressio unius</u> inference that, by dispensing with any
requirement of probate court approval for the sale of "other"
property, Decedent effectively required probate court approval
for the sale of the Stock,[34] there is plainly no requirement of
probate court approval expressed or implied for its distribution

right of first refusal in place even if the Bylaws and Articles
changed, or simply to make sure that the co-executors would keep
the right in mind.

[34] Not that this inference is unassailable.  Rather, it
seems that, if Decedent wished to require probate court approval
for the sale of the Stock, she would have simply said so, rather
than leaving it to be teased out by a far-fetched inference from
a paragraph at the end of the Will.  Nor is it even clear
whether or not the reference to "other property not specifically
devised or bequeathed hereunder" encompasses the Stock.   In
other words, does the Stock count as "specifically devised or
bequeathed" property or does it count as "other property"?
Nevermind, for even if the Court gives that phrase the sweep
urged by the Bank, the Bank's theory fails for the reasons
articulated in the text above.

in kind. Thus, seeking probate court approval prior to distributing the Stock was not mandated by the Will.

In sum, as a matter of sound legal interpretation, Clause Tenth provided for no more than a right of first refusal for Nyman in the Stock or, at most, a right of first refusal coupled with a direction to the co-executors to offer the Stock to Nyman.

Finally, once it is settled that Clause Tenth did not compel the co-executors to sell the Stock (as opposed to merely offer it for sale)--which, as explained, it plainly did not--it does not matter for the purposes of the delay claim whether the second and third components of the Bank's interpretation of Clause Tenth are correct.[35] For even if it were true that Clause Tenth directed the acceptance of a bargain price, and even if it were true that there could be no distribution without probate court approval--both of which, as explained, are not true--none of this can justify the delay. As for the bargain price theory, Nyman twice rejected the co-executors' offer to sell, bargain price or no bargain price. There being no possibility of a sale, the price at which the sale would occur is a moot point. As explained, the co-executors should have attempted an in-kind distribution after Nyman rejected their first offer or, at the

---

[35] It might matter for purposes of the other claims, as discussed below.

latest, after it rejected the second offer. Whether the co-executors should have sold at a bargain price or at some other price if Nyman had expressed any interest in buying back the Stock is a question that simply does not come into play for purposes of the delay claim, because Nyman expressed no such interest until the end of the relevant period.

Similarly, even if Clause Tenth provided that a distribution in kind could not be accomplished <u>without</u> probate court approval, it certainly never provided that it could not be accomplished even <u>with</u> probate court approval. Nor does the Bank contend that Clause Tenth's supposed prohibition of a distribution absent probate court approval somehow compelled the co-executors to wait eight years before they finally requested probate court approval for a distribution.

In sum, throughout the years preceding this litigation, when they were administering the Estate, the co-executors did not harbor the interpretation of Clause Tenth now advanced by the Bank; the interpretation advanced by the Bank is incorrect; and, even if the interpretation were correct and even if the co-executors had believed it at the time, it could not justify the delay. Thus, the Bank's explanation that Clause Tenth justifiably caused or contributed to the delay is unpersuasive.

ii.  Roland Burt's Suit

The Bank's second justification for delaying the distribution of the Stock is Roland Burt's lawsuit and his persistent demands, particularly through Attorney Thomas Pearlman, for all kinds of information.  The first thing to be said about this proffered justification is that it cannot excuse the Bank's failure to file an accounting, distribute the Stock, and wind up the Estate <u>before</u> Roland Burt filed suit--that is, before March 1993--or, at the earliest, before Pearlman appeared on the scene--that is, April 9, 1991.  Gates effectively conceded this point in response to the Court's questioning:

> The Court:  So what I'm trying to figure out is, if you reached the conclusion that you could distribute the stock in 1995 absent this $145 offer from Nyman, then why couldn't you have distributed the stock in 1990 when there was no offer from anyone?
>
> Gates:  I think we could have, actually.  If we had the -- I think once all the debts were paid, I think we could do that.
>
> The Court:  All right.  So why didn't you?
>
> Gates:  Why didn't we distribute it?
>
> The Court:  Yes.
>
> Gates:  I don't know why.  We were still fooling around with the litigation from Burt.
>
> The Court:  I'm talking about before the Burt litigation.  So from 1990 to March of 1993, there's about a three-year window there between when everything was done and you were --

Gates:  I don't know why the stock was not done anything with at that time.  We didn't have any offers.  I don't know why it was not --

The Court:  Did the estate need to be fully closed before it was distributed?

Gates:  I beg your pardon?

The Court:  Did you need to fully close the estate before such a distribution could occur?

Gates:  I had requested, you know, the preparation of the accounting at that time, and we just hadn't got it done.

The Court:  Okay.  But you felt that you had the authority to distribute it?

Gates:  Yes, I thought so.

(Trial Tr. 30-31, Nov. 1, 2010.)  Thus, clearly, the Roland Burt suit could not justify the failure to distribute the Stock before Pearlman's entry of appearance.

As for the period after Pearlman's entry of appearance, Tyler and Gates testified persuasively that Roland Burt, through Pearlman, made all sorts of pesky and irrelevant requests for information and criticized the co-executors without having a real understanding of how the Estate was being administered.[36] The co-executors are also correct that it would have been

---

[36] For example, Roland Burt repeatedly complained that the Bank's internal valuation for estate tax purposes undervalued the Stock.  However, as the co-executors told Roland Burt and Pearlman more than once, not only was the valuation approved (as adjusted) by the IRS, a higher valuation would not have benefited the Beneficiaries; if anything, it would have increased the estate taxes payable by the Estate.

preferable to resolve Roland Burt's claims before attempting to close the Estate, so that the claims would not linger on and potentially necessitate revisiting the Estate.

However, the claim that dealing with Roland Burt's complaints justified a further delay of four and a half years (from April 1991 to September 1995) before petitioning the probate court for distribution will simply not fly. If Roland Burt's demands were mostly unsubstantiated nuisances, as the co-executors have claimed they were, it is unclear why the Bank dillydallied with Roland Burt and Pearlman for so long. It should have promptly demanded a clear explanation of the claims, investigated them to determine whether they were meritorious, and decided what to do about them. It had two years to do this between the time Pearlman entered his appearance and when he filed suit on Roland Burt's behalf. Given what the co-executors have presented as the manifest baselessness of Roland Burt's complaints, this was more than enough time to discover that they were unfounded and move to distribute the Stock, which would also have forced a hearing on, and a resolution of, Roland Burt's claims before the probate court. Indeed, Gates urged precisely this course of action in September 1992: "If we cannot reach a prompt resolution of this matter with Attorney Pearlman, after we have furnished all available information to him, then we should file the accounting with the Probate Court

and request a hearing." (Ex. 89, letter dated Sep. 22, 1992 from Gates to Tyler; see also Facts ¶¶ 35, 47.)

The Bank at one point explains its prolongation of the Roland Burt business as "an effort to appease Mr. Burt and his attorney." (Def.'s Post-Trial Br. 14.) However, there is no duty to appease. The Bank cannot be heard to complain on the one hand that Roland Burt's claims were utterly unfounded and on the other hand that it kept the Beneficiaries waiting for four and half years while it attempted to "appease" the bringer of these unfounded claims. As the Bank itself correctly points out (Def.'s Post-Trial Br. 82 n.4), an executor's duty is to the beneficiaries as a whole, and if one beneficiary makes unreasonable demands, the co-executor is not justified in imperiling the interests of the other beneficiaries by undue delay while it needlessly plays along with the unreasonable beneficiary. The petition to distribute should have been filed before Roland Burt filed suit.

And once Roland Burt did file suit, it is not clear why the co-executors did not move to dismiss it. Roland Burt's two-page complaint is entirely conclusory and devoid of factual content. (See Ex. 102, Complaint.)[37] In view of the patent inadequacy of the complaint, it is not clear why the Bank filed an answer and

---

[37] Of course, the Court expresses no opinion as to the merits of Roland Burt's claims as they might have later developed.

prolonged the matter by fruitless negotiations instead of moving to dismiss.

This aside, it should have become clear to the Bank at some point that its efforts to settle the suit were not bearing fruit. This point could have been October 1991, when the co-executors prepared a revised accounting and a modified release form and sent them to Pearlman and Roland Burt (but not to the Beneficiaries who are plaintiffs in this case) and Roland Burt did not sign it; it could have been September 1992, when Gates again urged filing an accounting with the probate court; it could have been February 1993, when Gates wrote to Pearlman that "there is nothing to settle here and [] you will have to take whatever action you deem necessary" and again asked Tyler for an accounting to file with the probate court; it could have been May 1993, when Pearlman failed to explain Roland Burt's specific demands and instead took Gates for a walk in a cemetery; it could have been August 1993, after Nyman rejected the co-executors' second offer to buy back the Stock; or, at the latest, it could have been in 1993, after Pearlman was suspended from the practice of law. At any one of these points, the co-executors should have filed an accounting and petitioned the probate court for a distribution, which would also have forced a

hearing on and a resolution of Roland Burt's claims.[38]   All things considered, Roland Burt's suit cannot remotely justify the extent of the co-executors' delay.

      iii.  Receipt and Release and Indemnification Forms

The third justification offered by the Bank for the delay is that the Beneficiaries would not sign an indemnification or receipt and release form so that the Stock could be distributed to them. (See Def.'s Post-Trial Br. 17, 22, 64, 85, 94-95 et passim.)  A number of considerations render this proffered justification unpersuasive.

First, the authorities cited by the Bank do not support the proposition that the co-executors were required to obtain receipts or indemnifications from the Beneficiaries before filing an accounting or a petition to distribute with the probate court.[39]  The only authorities cited are R.I. Gen. Laws

---

[38] There is no doubt that a petition to distribute could have been filed while the Roland Burt suit was pending.  In fact, that is what was ultimately done but far too late.

[39] Citing to Tyler's trial testimony, the Bank claims that "[s]tandard estate practice in Rhode Island by corporate executors is to request and obtain from residuary beneficiaries a standard form of receipt and release, including a refunding obligation, before any significant distribution is made in advance of closing the estate." (Def.'s Post-Trial Br. 17.)  In view of Tyler's obvious self-interest in making this statement, his lack of legal training, and the lack of any other support for this proposition, the Court does not find this statement of what "standard estate practice" in Rhode Island is to be credible.  Nor does the Court see any reason to conclude that it

§§ 33-13-5 and 33-13-20,[40] both of which are clearly inapposite. R.I. Gen. Laws § 33-13-5 provides that, in some cases, "<u>the probate court</u>, if the executor or administrator consents, <u>may</u> require that the legatee shall first give bond to the executor or administrator" (emphases added). Plainly, this speaks to what the probate court may do, not what the executor must do.

As for R.I. Gen. Laws § 33-13-20, it has nothing to do with a requirement to obtain an indemnification or release form from beneficiaries. Rather, it provides for a statutory indemnification right for a debtor who pays more than his just share to a creditor because another debtor has paid less than her just share. This, if relevant at all (which is doubtful), has the effect of obviating the need for obtaining indemnification by contract, because the indemnification obligation is provided for by statute.

Indeed, the co-executors ultimately filed an accounting and a petition for distribution with the probate court without having obtained releases or indemnifications from the

was proper in this case to follow this purported "standard estate practice."

[40] Actually the Bank cites R.I. Gen. Laws § 33-13-26, but this seems to be an error, as there is no such statute. The language quoted by the Bank appears in R.I. Gen. Laws § 33-13-20.

Beneficiaries. Without a doubt, obtaining an indemnification, receipt, or release was not legally required.[41]

Even if not required, however, was it nevertheless proper or advisable for the co-executors to obtain receipt and release or indemnity forms before petitioning the probate court? The Bank says it was and claims that this is the preferred practice in closing an estate. This may or may not be true--there is no citation for the point nor any evidence of it except for Tyler's and Stewart's ipse dixit--but even if true, the way that the Bank went about attempting to obtain indemnification agreements was not the right way to do it. The accounting that was distributed to the Beneficiaries on March 18, 1991 identified the Stock as having been distributed on particular dates and required the Beneficiaries to acknowledge having received such distribution in the past, whereas in fact the Stock had not been distributed. Thus, the receipt and release form effectively asked the Beneficiaries to forego their right to receive the shares of Stock promised to them under the Will. It did so by asking the Beneficiaries to accept certain cash disbursements as

---

[41] Citing to the trial testimony of Robert Stewart, an attorney who has never been admitted to the Rhode Island bar nor practiced in Rhode Island, the Bank states that "[i]ndemnity agreements of this kind are a standard requirement under the circumstances." (Bank's Post-Trial Br. at 64.) This is pure ipse dixit. If the claim is that something is a legal requirement, there must be a reference to the law that requires it. It will not do to have an attorney testify that it is the law, even assuming the attorney was well-qualified.

"full payment and satisfaction" of their residuary interest under the Will and to release the co-executors from the obligation to give them anything else--despite the fact that the co-executors had never distributed the Stock. See Facts ¶¶ 30, 32.

The October 1991 "revised accounting" sent to Roland Burt corrected these errors by not identifying the Stock as having been distributed and showing the balance of undistributed property remaining in the Estate. Also, unlike the receipt and release form sent to all Beneficiaries in March 1991, which asked the Beneficiaries to accept the distributions hitherto made as "full payment and satisfaction" of their interest under the Will, the "modified receipt form" sent to Roland Burt in October 1991 simply asked for an acknowledgement that they have received the property indicated in the accounting. See Facts ¶ 38. However, the revised accounting and modified receipt form were not distributed to the Beneficiaries who are plaintiffs in this case (Facts ¶ 40 & n.7), so they were never given an opportunity to approve an accounting that was accurate and to sign a release form that did not oblige them to attest to something that was false.

Instead, the co-executors waited for more than another three years--until December 9, 1994--before they sent any form of accounting to the Beneficiaries. By this time, the delay had

extended too long. Given that no accurate accounting and no reasonable receipt or release or indemnity form had been provided to the Beneficiaries from the time of the co-executors' appointment until the distribution of the release forms in December 1994, the delay cannot be attributed to the Beneficiaries' failure to sign receipt and release forms.

Moreover, the accounting distributed in December 1994, like that distributed in March 1991, showed the Stock as having been distributed in kind equally among the ten Beneficiaries. But in fact the Stock had not been distributed by December 9, 1994, just as it had not been distributed by March 18, 1991. Facts ¶ 70. And the receipt and release form sent in December 1994, like that sent in March 1991 and in contrast to the one sent to Roland Burt in October 1991, provided for the Beneficiaries to release the co-executors from any and all claims under the sun, rather than simply acknowledging receipt of the distribution.

Additional factors further undermine the Bank's reliance on the receipt and release agreements as a justification for delay. First, given the Beneficiaries' lack of legal and business sophistication, and given the history of their acrimonious relationship with the Bank, due in part to its delay in administering the Estate, it is natural and understandable that they would not understand the meaning of receipt and release or

indemnity forms and would be leery of them. This is evident, for example, in Janice Leffingwell's letter of December 14, 1994, which clearly shows that she did not understand what the release meant and misconstrued it to mean that she was personally on the hook to the extent that she would have to risk her house. See Facts ¶ 74. The co-executors never adequately explained these forms to the Beneficiaries so as to allay their concerns arising from a lack of sophistication in legal and estate affairs.

Secondly, the credibility of the co-executors' claim that they would have distributed the Stock had the Beneficiaries signed the receipt and release form is undermined by the fact that they did not distribute the Stock even to those Beneficiaries who did sign it. It is no answer to say that no distribution could be made without probate court approval. As explained above, probate court approval was not required by Clause Tenth of the Will. See supra at 70-71. Even if it were, it is hard to see why the co-executors did not simply petition the probate court for distribution pending the execution of releases and ask for indemnification by order of the probate court. In fact, this is precisely what they ultimately did after long delay.

In sum, requiring receipt and release or indemnity forms was not a legal precondition for the distribution of the Stock.

To the extent that there is any authority for such a requirement, the statute provides for the requirement to be imposed by order of the probate court, which the co-executors did not seek to obtain until they finally petitioned the court for distribution in September 1995. Moreover, the receipt and release and indemnity forms that the co-executors did provide to the Beneficiaries were accompanied by erroneous accountings, such that they required the Beneficiaries to attest to the accuracy of something that was not accurate. Nor did the co-executors adequately explain the nature and purpose of the release and indemnity forms to the Beneficiaries. Finally, even the Beneficiaries who did sign the forms did not receive any distribution of the Stock. In view of all this, the failure of some Beneficiaries to sign receipt and release or indemnity forms cannot justify the co-executors' delay in distributing the Stock.

iv.   Additional Justifications

The Bank throws in a number of other justifications for delay which it does not pursue in any detail. It claims that "[t]here was a tax audit, many obsolete, replaced or worthless securities to deal with, and Nyman Mfg.'s financial inability to redeem the shares." (Def.'s Post-Trial Br. 64.) But the tax audit issues had been resolved by February 1990 or at the latest by July 1990. Facts ¶¶ 18, 20 & n.4. As for the obsolete

securities, there is no evidence, except for the Bank's conclusory assertions, of what these were and how they complicated the closing of the Estate. In any event, the only contemporaneous mention of this issue occurs before the co-executors distributed the first accounting in March 1991 (see Ex. 42, letter dated Nov. 29, 1990 from Tyler to Gates), and it must have been resolved by the time the first accounting was distributed. And Nyman's ability vel non to redeem the Stock is irrelevant to the questions as to why the co-executors did not file an accounting with the probate court, did not petition the probate court to distribute the Stock, and did not distribute the Stock.

The Bank also claims that "the co-executors did not have the practical ability to distribute the stock in-kind because the shares would have to be re-registered through Nyman Mfg." (Def.'s Post-Trial Br. 7.) The Bank provides no factual support nor evidence (except for Tyler's ipse dixit) for the proposition that the Stock would have to be re-registered. More importantly, the Bank does not explain why re-registering the Stock would be outside the co-executors' "practical ability." Finally, the Bank claims that there was "no urgency" to distribute the Stock because it was "unmarketable, restricted, non-voting stock which the issuer was not prepared to redeem." (Id. at 13.) This argument obviously proves too much; if it

were true, executors could indefinitely hold on to all securities of private corporations, leaving beneficiaries perpetually hanging.[42] In the final analysis, none of the Bank's proffered justifications excuses its neglect and delay in filing an account with the probate court and acting to distribute the Stock and close the Estate.[43]

First Conclusion of Law: The Bank breached its fiduciary duties to the Beneficiaries by its undue delays in filing an accounting with the probate court, petitioning the probate court to distribute the Stock to the Beneficiaries, distributing the Stock to the Beneficiaries, and closing the Estate.

---

[42] The Bank points out that, given its fee schedule, it would obtain no financial benefit from delaying the administration of an estate. (Def.'s Post-Trial Br. 11-12.) Even if true, this point has no bearing on the delay claim, because bad faith or improper motivation is not an element of a breach of fiduciary duty claim. See supra at 53.

[43] It is worth noting that, by going through the Bank's proffered justifications for delay, the Court does not imply that the burden is on the Bank to prove that it did not breach a fiduciary duty. The burden of proving a breach is, of course, on Plaintiffs. See supra at 51-52. However, as stated in the beginning of the delay analysis, it is clear that the length of time the Bank took in this case would ordinarily constitute undue delay given the size of the Estate. Thus, Plaintiffs have carried their initial burden, and the Bank's justifications for the delay are in the nature of affirmative defenses on which it carries the burden. In any event, the result here hinges in no way on the issue of burden placement; the call is simply not a close one, and the Court would find a breach no matter how it were to allocate the burden.

D.    The October 19, 1995 Probate Court Hearing

As the Facts and the preceding discussion make clear, the Bank unjustifiably waited almost eight years to file an accounting with the probate court and more than eight years to petition the probate court to distribute the Stock.  And when the Bank finally woke up and smelled the coffee, it was as a result of outside influences that opened its eyes to the potential costs of delay.  No account was filed with the probate court from April 1988 to March 1995.  Then, four days after Roland Burt's new attorney Marvin Homonoff threatened to file a petition to render an account, Gates finally filed an account with the probate court.  It is hard to resist the impression that Homonoff's draft petition to render an account had some non-negligible effect in awakening the co-executors from their slumber.  As for the petition to distribute, it does not seem coincidental that, after eight years of inaction, it was finally filed approximately two months after Nyman offered to purchase the Stock.  Gates, as well as some Beneficiaries, pleaded repeatedly with the Bank to file an account and distribute the Stock from 1990 onward, only to be ignored.  But when Nyman's offer came, it finally forced the Bank to do something with respect to the Stock.  Unwilling to take on the more burdensome task of independently appraising the Stock, assessing the adequacy of the offer, and negotiating with Nyman about it (see

Facts ¶¶ 107, 109-114; _infra_ Part II.E), the co-executors decided to punt and leave the decision to the Beneficiaries and the probate court. This brings us to the probate court hearing on October 19, 1995.

The claim for breach of fiduciary duty in connection with the October 19 hearing is straightforward: According to their own testimony, both co-executors went into the hearing believing that distribution in kind of the Stock was the course of action that best served the Beneficiaries' interest; however, they did nothing to make sure distribution would occur. Indeed, what they did was very little: they filed a short petition for distribution which did not flesh out why distribution was called for and simply read from it at the hearing. What they failed to do was a lot: they did not advocate for distribution beyond a _pro forma_ reading from the petition; they never argued for it, never told the probate court why distribution was in the best interest of the Beneficiaries, and never compared it to alternatives such as sale; when attorney Yesser gave a presentation in favor of a sale and against a distribution, they did not object, did not contradict him, did not say that distribution was better than sale and why, did not even renew a demand for distribution, and in short did nothing in response; when the probate court ordered a sale, they did not object, did

not ask the court to reconsider, did not appeal the order, and did not inform the Beneficiaries that they could appeal.

Indeed, in view of the co-executors' perfunctory presentation of the petition, coupled with their utter passivity in the face of a forceful argument in support of a course of action directly contradicting the petition, the probate court might well have thought that the co-executors were no longer pressing for a distribution and were happy with a sale. Facts ¶ 151.

The co-executors' failure to meaningfully advocate for a distribution is so abject a failure that one is hard pressed to believe that they actually wanted a distribution. But they both testified that this is exactly what they wanted and that they thought distribution best served the Beneficiaries' interest. (Trial Tr. 176, 177 Oct. 27, 2010 (Tyler); Trial Tr. 99, Oct. 29, 2010 (Gates); see also Def.'s Post-Trial Rep. Br. 4 ("The Co-Executors wanted to distribute the Stock.").) This testimony is supported by contemporaneous evidence confirming that they thought so at the time, not the least of which is a petition signed by both co-executors and filed with the probate court requesting a distribution. (See Ex. 316, Petition; Facts ¶ 143; see also, e.g., Ex. 226, fax dated Sep. 22, 1995 from Tyler to Gates.) The co-executors' failure to meaningfully and vigorously pursue the course of action that they thought best

served the Beneficiaries' interest is the very definition of a breach of fiduciary duty.

The Bank offers precious little to justify the co-executors' inaction. It argues that it "decided that the petition was the best approach to resolve the issues because it would put them squarely in the hands of the Probate Court. Essentially, the Bank was looking for instructions as to how to proceed." (Def.'s Post-Trial Br. 37.)

This argument fails on two levels. First, it was the co-executors' fiduciary duty, not the probate court's, to look out for the interests of the Beneficiaries. It is axiomatic that a fiduciary cannot escape responsibility by simply shifting its duties to someone else. <u>Washington Trust Co. v. Bishop</u>, 80 A.2d 185, 187 (R.I. 1951) (holding that "the agent may not delegate the performance of his duties in the matter without express authority from the principal unless such power is necessarily implied for the proper execution of the agency," and characterizing this as a rule "so fundamental as to require no citation of authorities"); Restatement (Second) of Trusts § 171 ("The trustee is under a duty to the beneficiary not to delegate to others the doing of acts which the trustee can reasonably be required personally to perform."). The rule might admit of exceptions where the delegated function is ministerial only, <u>Washington Trust</u>, 80 A.2d at 187, or where specific delegation

procedures are followed pursuant to the terms of the trust, Restatement (Second) of Trusts § 171 cmt. j, or a statute like ERISA, 29 U.S.C. § 1105(c)(1), but this case does not fit any of those exceptions. Rather, the Bank is blatantly shirking its duties and claiming that it is off the hook because the decision was the probate court's to make. If an executor could avoid all the hard choices by simply dropping the ball into the probate court's court, the function of an executor would be superfluous.[44] And the co-executors' attempt to shirk their duties in this case is made all the more inexcusable by the fact that the choices were made hard only by their own failure to distribute the Stock much earlier. The co-executors dragged their feet for eight years and then were faced by Nyman's offer with a situation where they had to decide between distribution and sale. Unwilling to do their homework, and unwilling to accept responsibility for the consequences of their choice, they dodged their duty and punted to the probate court. They did so at their own peril.

---

[44] The Bank claims that, "[i]n Rhode Island estate practice, a probate court judge can substitute the Court's judgment for the executor's judgment" and "[e]xecutors can petition the probate court for instructions." (Def.'s Post-Trial Br. 37.) The Bank does not cite any authorities for this proposition. But even if it were true, the co-executors did not petition the probate court for instructions; they petitioned it for a distribution.

Second, the Bank's argument that it was placing the choice in the probate court's hands flatly contradicts the testimony of both co-executors that they thought distribution in kind was the best option for the Beneficiaries. Given that the co-executors had decided that distribution in kind was the best result, their duty was to attempt to bring about that result. They should have attempted to convince the probate court to do what they thought was best for the Beneficiaries, not to "look[] for instructions." Moreover, the petition did not ask for instructions; it asked for a distribution. (Ex. 316, Petition.)[45] This reaffirms that distribution was indeed the course of action that the co-executors had decided on. Having decided on it, the co-executors should have tried to accomplish it. They did not.[46]

---

[45] Obviously, it would have been questionable (if not downright unethical and wrongful) for the co-executors to petition a court of law asking for one thing while they actually wanted something else. Not surprisingly, Tyler testified for the Bank that the petition intended what it said. (Trial Tr. 101, Oct. 27, 2010 ("Was the filing of the petition to distribute the stock in kind to the beneficiaries just a sham to cover a real intent to sell the stock to Nyman Manufacturing Company? [Tyler:] Absolutely not.").)

[46] In determining whether the co-executors breached their duty, it is not necessary to explain <u>why</u> they failed so miserably to advocate for their chosen course of action, particularly when it came to responding to Yesser's presentation. However, in the interest of developing a fuller story, the Court sets forth two related explanations that appear plausible in view of all the testimony and documentary evidence. First, it appears that the co-executors were cowed by Yesser,

As for the failure to appeal the probate court's order, the Bank attempts to justify it by claiming that the Beneficiaries had notice of their right to appeal and could have done so themselves and that it thought that the probate court's decision was reasonable under the circumstances and did not want to undo the sale. (Def.'s Post-Trial Br. 46-47, 63.)

On the notice issue, the Bank does not claim that the co-executors actually told the Beneficiaries that they could appeal the probate court's order. Rather, it says that "this ability was referenced in the petition" to distribute. (Id. at 46.) There is a reference to "any appeals to the Superior Court" in the petition for distribution in connection with the request for an indemnity agreement. It is not clear whether the "appeals" referenced there comprehend an appeal of the probate court's

who was an experienced attorney and a forceful presence. Secondly, as will become clear in the discussion of the failure to investigate claim (see infra Part II.E), the co-executors were unwilling to perform the due diligence necessary to come to a firm conclusion as to what course of action best suited the Beneficiaries' interests. They both concluded that a distribution in kind was best, but this was a conclusion they reached intuitively in view of all the circumstances, rather than by a rigorous examination of Nyman's business and the merits of its offer. Therefore, they were not confident enough in their own conclusion to give it their full-throttled support and go to bat for it, particularly not against Yesser. Instead, they sought to have it both ways by, on the one hand, putting it on the record that they favored distribution so as to escape the charge of indecision while, on the other hand, placing the decision in the probate court's hands so as to escape responsibility for any adverse consequences that might flow from it.

order. Even if they do, the reference is so oblique, so incomplete, and so deeply buried within a discussion of other topics that it is insufficient to advise unsophisticated laypeople like the Beneficiaries that they had a right to appeal the probate court's order. Thus, the co-executors' notice to the Beneficiaries was inadequate.[47] Nor is the Bank justified in defending its failure to carry out its duty to act in the Beneficiaries' best interest by claiming that the Beneficiaries should have taken charge themselves. The function of a fiduciary exists for a reason.

And the Bank's argument that the probate court's decision was reasonable under the circumstances cannot be squared with its decision that distribution was the best course of action for the Beneficiaries. Again, having decided that distribution was the best option, the Bank cannot turn around and claim that an alternative would serve just as well. There is no claim that any new information came to light during the probate court hearing that changed the co-executors' mind that distribution was the best option. Certainly, it cannot suddenly have ceased to be so the second the probate court handed down its decision.

---

[47] There is a fax from John Kiepler (the husband of Beneficiary Beverly Kiepler) to Gates that appears to evince his (and, perhaps, by extension, Beverly Kiepler's) knowledge of the right to appeal. (See Ex. 244.) It is not clear how he came to know this. There is nothing to suggest that other Beneficiaries shared this knowledge.

The Bank cannot have it both ways by claiming on the one hand that it adequately considered the Beneficiaries' interests and decided that distribution was best for them and on the other hand that the decision was up to the probate court. Again, having decided that distribution was the best course of action, the co-executors should have meaningfully pursued it, including by appealing the probate court's order.

Second Conclusion of Law: The Bank breached its fiduciary duties to the Beneficiaries by failing to meaningfully advocate for a distribution of the Stock, a course of action which it thought best served the Beneficiaries' interest, at the October 19, 1995 probate court hearing.

Third Conclusion of Law: The Bank breached its fiduciary duties to the Beneficiaries by failing to appeal the probate court's order to sell the Stock when it believed that distribution in kind was best for the Beneficiaries.

E.    Handling Nyman's Offer

It is undisputed that, when the co-executors received Nyman's offer to buy back the Stock in July and August of 1995, they did not independently check the accuracy of data provided by Nyman in connection with the offer, did not determine whether the materials enclosed by Nyman were sufficient to enable an informed decision on the offer, did not investigate Nyman's business, did not appraise the Stock, and did not negotiate with

Nyman over the price or other terms of the offer. It is unquestionable that, ordinarily, these inactions would constitute a breach of fiduciary duty. See Hanley v. Alarie, 746 A.2d 125, 128 (R.I. 2000) (upholding the trial court's judgment that the executor breached her fiduciary duties by accepting a realtor's appraisal without seeking the advice of another sales agent, broker, or appraiser and without independently verifying the reasonableness of the sales price). However, the Bank claims that several factors justified its inaction in this case.

First, the Bank argues that Clause Tenth of the Will obligated it to sell the Stock to Nyman at a bargain price. This argument was analyzed and rejected above, and there is no need to repeat the analysis here.

Second, the Bank argues that it was justified in failing to perform due diligence because the offer's condition of unanimous approval was unlikely to be met and because the tight deadline imposed by Nyman "made a full valuation impractical." (Def.'s Post-Trial Br. 45-46.) This argument begs the question. Part of the claim of breach is that the Bank failed to negotiate the terms of the offer, so it makes no sense to defend it by arguing that the terms of the offer made it difficult to perform the due diligence required of an executor. The terms of the offer are

what the Bank should have negotiated.[48]  Indeed, the Bank was so submissive when it came to dealing with Nyman that it did not even take up Nyman on its own offer to guarantee that the Company was not for sale, even as it was worried about the possibility of such a sale.  (See Ex. 222, email dated Sep. 21, 1995 from Jeremy Weir to Tyler and others at the Bank; Facts ¶¶ 131-132.)

Nor does it make sense to argue that, "since the co-executors were not in a position to accept or reject the offer on their own, . . . the decision to accept or reject should be put directly in the hands of the beneficiaries." (Def.'s Post-Trial Br. 29-30; see also id. at 45-46, 84.)  For if it is conceded that the Bank, with all its sophisticated institutional apparatus, was unable to reach an informed decision with respect to Nyman's offer, the Bank should have known that the unsophisticated Beneficiaries were a fortiori unable to reach an informed decision.  Thus, rather than dumping the offer on the Beneficiaries, the thing to do would have been to request a reasonable amount of time and the materials necessary to perform

_____

[48] For the same reason, the Bank's claim that it "understood that Nyman's offer price of $145.36 per share was not a negotiable figure" (Def.'s Post-Trial Br. 32) is unavailing.  It is not clear where this purported "understanding" comes from. Even if Nyman said that (of which there is no evidence), that is obviously not enough to obviate the co-executors' duty to negotiate.  Not having attempted to negotiate anything, the Bank was not in a position to determine whether and to what extent Nyman's offer was negotiable.

the due diligence customarily done by fiduciaries to enable an adequate assessment of an offer to purchase.[49]  But the Bank not only did not negotiate with Nyman to extend its deadline in order to allow an independent assessment of the offer, it actually gave the Beneficiaries a shorter deadline than Nyman itself had imposed.  See Facts ¶ 121.

The Bank also argues that "a full valuation of Nyman Mfg. would have been expensive and wasteful if the condition of unanimous approval could not be met," particularly in view of the fact that the "beneficiaries had already complained about the expenses incurred by the Estate." (Def.'s Post-Trial Br. 46; see also id. at 84.)  However, whether the condition of unanimous approval could be met would have depended on the terms of the offer; not having negotiated the terms of the offer, and not having asked the Beneficiaries whether they would sell their Stock and at what price and under what terms, the Bank had no way of knowing a priori at the time that "the condition of

---

[49]  This is exactly what the Bank did as trustee of the Walfred Nyman Trust in connection with Nyman's offer to purchase the shares of Stock held for that Trust.  See Facts ¶¶ 177–179. The contrast between the Bank's performance as trustee of the Walfred Nyman Trust and its performance as co-executor of the Will is the contrast between due diligence and inaction. However, as it is doubtful whether the facts relating to the Bank's actions in connection with Nyman's offer to purchase the Stock in the Walfred Nyman Trust are properly in the record, the Court does not rely on any of these facts in reaching its conclusions of law.

unanimous approval could not be met."[50]   This is an excuse conveniently concocted after the fact.

As for expense, of course carrying out one's fiduciary duty is bound to consume more resources than doing nothing, but that is not an excuse to do nothing.   If there were particular avenues of investigation that were more expensive than others it might have been reasonable for the Bank to pursue the less expensive avenues, or to consult with the Beneficiaries as to the tradeoffs between expense and thoroughness of the investigation.   However, the utter abdication of the duty of independent investigation and due diligence cannot be justified by its purported expense.   And the Beneficiaries' other complaints about the expenses charged to the Estate stand or fall on their own and do not bear on the Bank's duty to investigate an offer to buy the primary asset in the Estate.

Finally, the Bank mentions that "the Closely-held Business Group of the Bank had been following the company's financial performance and had established annual carrying values." (Def.'s Post-Trial Br. 46.)   However, Tyler testified that he was not informed of these periodic valuations (Trial Tr. 20,

---

[50]   Moreover, the "condition of unanimous approval" was itself an offer condition that the Bank could have negotiated if it believed it hampered the Beneficiaries' interests.

Oct. 25, 2010),[51] and there is no evidence that Tyler, or any of the Bank officials involved in administering the Estate, consulted these values or reviewed the investigation (whether or not adequate) undertaken to arrive at them in connection with the Nyman offer. Indeed, the then most current carrying value was $182, $36.64 higher than the price offered by Nyman. See Facts ¶¶ 42, 99.

The parties dispute whether the carrying value and book value established by the Closely-Held Business Group were an appropriate yardstick for evaluating the adequacy of Nyman's offer. It is not necessary to resolve this dispute. What is important is that the Bank did not even look into the matter.[52] This failure is all the more glaring in view of the fact that the other co-executor, Gates, believed that a fair price for the

---

[51] Tyler testified elsewhere that he "would have seen" the Closely-Held Committee's valuations. (Trial Tr. 39, Oct. 26, 2010.) However, considering the clarity of the testimony referenced in the text, the tentativeness of the later testimony just referenced, the latter's seeming conflict with earlier deposition testimony (see id. at 39-40), the witness's demeanor, his self-interest in testifying one way rather than the other, the absence of other evidence indicating his familiarity with the aforementioned valuations, and all other relevant circumstances, the Court finds the testimony referenced in the text more credible.

[52] The Bank also references redemption agreements between Nyman and two Beneficiaries (Judith Lawton and Beverly Kiepler) for shares of the Stock individually owned by them. These agreements provided for redemption at a price predetermined by a formula and are irrelevant to the issues at hand.

Stock would be in the vicinity of $403.35, making Nyman's offer price an extreme lowball. (<u>See</u> Trial Tr. 20-21, Nov. 1, 2010; Facts ¶ 102.) And it is more glaring still when one considers that Nyman's proposed price per share increased almost sixfold in about half a year--from $25 in its January 1995 letter to $145.36 in its August 1995 offer--a variation so large that it should have tipped off the co-executors to the necessity of verifying Nyman's claims and data.

<u>Fourth Conclusion of Law</u>: The Bank breached its fiduciary duties to the Beneficiaries in connection with Nyman's offer to purchase the Stock by failing to check the accuracy of data provided by Nyman, failing to determine whether the materials provided by Nyman were sufficient to enable an informed decision on the offer, failing to investigate Nyman's business, failing to appraise the Stock, failing to negotiate with Nyman over the price or other terms of the offer, and failing to secure a guarantee that Nyman itself had agreed to provide for the Beneficiaries' protection.

F.   Conflicts of Interest

The Plaintiffs allege two specific instances of conflict of interest.   The first is that the Bank allowed an impermissible conflict by attempting to preserve sufficient assets in the Estate to reimburse it for the expenses of defending the Roland Burt litigation in the event that the co-executors were found to

be not at fault.[53]   According to Plaintiffs, this created a conflict because it made the assets in the Estate of interest both to the Beneficiaries and the co-executors. (Pl.'s Post-Trial Br. 15.)

Plaintiffs are wrong.   If they were right, a conflict of interest would arise every time an executor looked to an estate asset for remuneration, and executors would be required to work for free.   Obviously, executors do not work for free, and they may look to the estate to pay their reasonable expenses if they are sued in connection with administering the estate, and the suit is found to be baseless.   See R.I. Gen. Laws § 33-18-19 (providing for reimbursement of reasonable litigation costs from the estate in certain circumstances); R.I. Gen. Laws § 9-14-25 (same); In re Estate of Cantore, 814 A.2d 331, 335 (R.I. 2003) (upholding the award of attorney's fees to co-executrix from the

---

[53] At one point during the trial, Tyler came close to testifying that the Estate would have to bear the expenses of Roland Burt's lawsuit, even if the lawsuit were ultimately successful in establishing the co-executors' malfeasance. (Trial Tr. 169, Oct. 25, 2010.)   However, this seems to have been the result of confusion or a slip of the tongue, as he immediately clarified that the Bank would have to bear the expenses itself if it were found to have been in breach (id.) and testified elsewhere that the Estate would have to bear the expenses only if Roland Burt's suit were unsuccessful (id. at 94-95).   This is consistent with the position taken by the Bank in its post-trial brief--that reimbursement for the expenses of the Roland Burt litigation is contingent on the Bank's prevailing in that litigation. (Def.'s Post-Trial Br. 63.)   The Court considers this to be the Bank's position now and throughout.

estate).  If it were otherwise, any beneficiary (or any other interested person) could create a conflict of interest and force an executor to resign by the simple expedient of filing suit. Plainly, that is not the law.[54]

Plaintiffs also allege that the co-executors permitted an inappropriate conflict of interest by working with Nyman in connection with the petition to distribute filed with the probate court in September 1995 and by failing to inform the Beneficiaries of their continuous communications with Nyman in this regard.  (Pl's Post-Trial Br. 74.)  The Bank counters that, "[c]harging Nyman Mfg. instead of the Estate does not evidence a divided loyalty or conflict of interest as urged by the Plaintiffs; instead, this action demonstrates the exact opposite--that the co-executors were acting in the best interest of the residuary legatees as a whole by reducing the expenses charged to the Estate."  (Def.'s Post-Trial Br. 41.)

There is a superficial appeal to the Bank's argument, but it misses the crux of Plaintiffs' theory.  That theory is not that allowing Nyman to pay Gates's bill for drafting the petition in itself created a conflict of interest; rather, it is

---

[54] The Court makes no ruling on whether the Bank is actually entitled to costs in connection with defending the Roland Burt suit.  That issue is not before the Court.  All the Court holds is that the mere act of looking to the Estate for reimbursement and of attempting to preserve enough assets to enable reimbursement in the event that such reimbursement would be justified did not create an impermissible conflict of interest.

that the entire course of negotiations, discussions, and communications between the co-executors and Nyman representatives preceding the filing of the petition with the probate court, which included allowing Nyman to review the petition before it was submitted and to have input into its content, gave rise at least to the possibility that the co-executors were permitting Nyman to take over the administration of the Estate and to secure by it a result that served its own, rather than the Beneficiaries', best interest. This is inescapably true. <u>See</u> Facts ¶¶ 138-142. Indeed, the Bank acknowledged as much in internal communications. (<u>See</u> Ex. 222, email dated Sep. 21, 1995 from Jeremy Weir to Tyler and others at the Bank ("I believe that the executors need outside counsel's advice . . . on the risk of involving or appearing to involve Nyman to resolve estate issues or appear to be conspiring against our beneficiaries."); <u>see also</u> Facts ¶ 134.)

This strong appearance of impropriety is strengthened further by what actually transpired afterwards. The fact that the petition on its face asked only for a distribution, but what actually happened at the hearing was that Yesser inserted himself in the middle and sealed the deal for a sale to Nyman, all while the co-executors, who believed that distribution was best for the Beneficiaries and had petitioned for a distribution, sat on their hands and said and did nothing,

creates at the very least an impression that an improper deal was struck with Nyman at the Beneficiaries' expense. The Court does not, and need not, make any finding as to whether such a deal was actually struck. For what is clear is that the tendency toward divided loyalty, the strong possibility of the co-executors adopting a position antagonistic to the Beneficiaries, was present. And such tendency and possibility is all that the law requires in finding an improper conflict of interest:

> Broadly speaking it is clearly established that a trustee must give undivided loyalty to the trust confided to his care and to its beneficiaries. It is the policy of the law to see that in administering the trust he shall not be tempted in any way by conduct or circumstances to act otherwise than with complete loyalty to the trust and its interest. He must at all times exercise a high standard of honor and avoid all situations and transactions that <u>tend to call his good faith into question</u> and to create in himself rights <u>possibly conflicting</u> with those of the beneficiaries. . . . [T]he law . . . does not permit the same person to occupy two antagonistic relations from which a <u>possible</u> conflict of duty may arise, and <u>will not stop to consider whether or not a sale in such circumstances in a particular instance is fair or otherwise</u>.

<u>Sinclair</u>, 153 A.2d at 552 (emphases added, citations and quotation marks omitted).

The co-executors' course of dealing with Nyman in connection with the preparation and presentation of the petition to distribute gave rise to the improper tendencies and possibilities referenced in the foregoing passage. Nor did the

co-executors do anything to dissipate the taint of impropriety. They thus permitted an improper conflict of interest.

Fifth Conclusion of Law: The co-executors' efforts to ensure that sufficient assets remained in the Estate to pay the reasonable expenses incurred by them in defending the Roland Burt litigation did not give rise to a breach of fiduciary duty or an improper conflict of interest.

Sixth Conclusion of Law: The Bank breached its fiduciary duties to the Beneficiaries and permitted an improper conflict of interest by collaborating with Nyman in preparing and presenting the petition to distribute to the probate court, by allowing Nyman to have input into its contents, and by seeking remuneration from Nyman in connection with this collaboration.

G. Damages

The reader need not despair that this exciting story is coming to a close soon. For the conclusions reached so far relate only to the elements of duty and breach and that is only half the story. To recover, Plaintiffs must also show that the Bank's breach was the actual and proximate cause of harm suffered by them. See supra Part II.A. It is to the elements of causation and damages that the opinion now turns.

Generally speaking, the end of tort damages is to restore the aggrieved party to the position he would have occupied had the tort not occurred. Restatement (Second) of Torts § 901

comment a ("[T]he law of torts attempts primarily to put an injured person in a position as nearly as possible equivalent to his position prior to the tort."); id. § 903 cmt. a ("When there has been harm only to the pecuniary interests of a person, compensatory damages are designed to place him in a position substantially equivalent in a pecuniary way to that which he would have occupied had no tort been committed."). In this respect, damages for breach of fiduciary duty mirror damages for torts. Id. § 874 cmt. b ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct to the person for whom he should act [and] the beneficiary is entitled to tort damages for harm caused by the breach of duty arising from the relation."); Restatement (Second) of Trusts § 205 ("If the trustee commits a breach of trust, he is chargeable with (a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or (b) any profit made by him through the breach of trust; or (c) any profit which would have accrued to the trust estate if there had been no breach of trust."); id. at cmt. a ("If the trustee commits a breach of trust, the beneficiary may have the option of pursuing a remedy which will put him in the position in which he was before the trustee committed the breach of trust; or of pursuing a remedy which will give him any profit which the trustee has made by committing the breach of trust; or of pursuing a remedy which

will put him in the position in which he would have been if the trustee had not committed the breach of trust."). The Court has "considerable discretion" in fashioning the appropriate remedy. Dennis v. Rhode Island Hosp. Trust Nat. Bank, 744 F.2d 893, 897 (1st Cir. 1984), overruled in part on other grounds by Salve Regina College v. Russell, 499 U.S. 225 (1991).

In this case, in accordance with the clearly established principles referenced above, Plaintiffs are seeking an amount of damages that would place them in the position they would have occupied had the breaches of fiduciary duty not occurred. (Pls.' Post-Trial Br. 77-78.) Accordingly, the first object of the exercise is to find--and this finding is an issue of fact-- what position the Beneficiaries would have occupied had the Bank not breached its fiduciary duties. But that satisfies only the requirement of but-for causation. The second object of the exercise, the proximate cause part, is to determine whether it should have been reasonably foreseeable to the Bank that its breach would place the Beneficiaries in the position that it did and take away from them the benefits that it did. See Peckham v. Continental Cas. Ins. Co., 895 F.2d 830, 836 (1st Cir. 1990) ("The touchstone is foreseeability: conduct results in liability if, and to the extent that, a foreseeable risk of harm materializes.") (citations, quotation marks, and brackets omitted); Doe v. United States, 737 F. Supp. 155, 159 (D.R.I.

1990) ("Whether the negligent act is also viewed as a proximate cause of the injury generally depends upon whether the injury was a reasonably foreseeable or natural and probable consequence of that act.") (citing <u>Hueston v. Narragansett Tennis Club, Inc.</u>, 502 A.2d 827, 830 (R.I. 1986)).[55]

Before plunging into these questions, it is necessary to connect the findings on breach with damages. The first, second, third, and sixth conclusions of law relate to breaches of duty that resulted in the Stock not being distributed to the Beneficiaries. Thus, the appropriate question to ask is what would the Plaintiffs have done if the Stock had been distributed to them and whether that was a foreseeable consequence of the failure to distribute. The fourth conclusion of law relates to a breach arising from the Bank's failure to perform the appropriate due diligence in responding to Nyman's offer to buy the Stock. Thus, the question is: What would have happened if the co-executors, instead of being idle and submissive, had been diligent and hard-nosed in handling Nyman's offer to purchase the Stock?

The Court finds that the likeliest outcome is that Nyman would not have pursued the matter any further with the co-

---

[55] To qualify as a proximate cause of harm, an act need not be the sole or last cause of harm; it is sufficient if it substantially contributes to the harm, albeit in conjunction with other causes. <u>Hueston v. Narragansett Tennis Club, Inc.</u>, 502 A.2d 827, 830 (R.I. 1986).

executors and would have let the Stock be distributed (finally) and then would have renewed the offer with the same price to the Beneficiaries. Several considerations support this finding of fact. First and foremost, it appears that, when Nyman first floated the idea of repurchasing the Stock, it did so expecting that it would be buying it from the Beneficiaries, rather than from the co-executors (on behalf of the Estate). This is clearly evidenced by Nyman's letter of January 30, 1995, which references an expectation that all remaining assets, including the Stock, will be distributed "to the beneficiaries within the next few weeks." (Ex. 132, letter dated Jan. 30, 1995 from Robert Nyman to Tyler, at 1; see also Facts ¶ 76.)[56] It is also evidenced by Judith Lawton's letter of February 17, 1995 to Tyler, complaining about the delay in the distribution. She wrote:

> You now state that this process [of distributing the Stock to the Beneficiaries] is postponed because Nyman Mfg. Co. has contacted you requesting that you be an intermediary between them and the ten recipients of

---

[56] The parties dispute whether this was actually an offer from Nyman. Several contemporaneous internal Bank communications refer to it as an offer. In any event, it does not matter whether it is characterized as an offer or not. What matters is that, at around this time, Nyman became interested in purchasing the Stock, and the fact that the purchase would be from the Beneficiaries individually rather than the Estate did not deter it from moving forward with the idea. Moreover, it is Plaintiffs who insist that the letter was an offer, which undermines their own position that Nyman would have bought only from the Estate through the co-executors and not from the Beneficiaries individually.

the stock from the Burt estate. Rob, that request has only to do with AFTER the estate is closed and the stock has been distributed!! I am in close contact with Keith Johnson at Nyman; and I believe he has emphasized that fact to you."

(Ex. 134, letter dated Feb. 17, 1995 from Judith Lawton to Tyler (cc to Gates) (emphasis in original); see also Facts ¶ 79.) As previously found (Facts ¶ 79 & n.11), Judith Lawton was at this time in regular contact with Keith Johnson, and her contemporaneous letter is credible evidence of Nyman's intentions.[57]

Moreover, in May 1996, Nyman actually offered to redeem all outstanding shares of the Stock held individually or as part of the Walfred Nyman Trust by Beverly Kiepler and Judith Lawton for $200 per share. See Facts ¶ 185. This, coupled with the evidence from Nyman's January 1995 communication and Judith Lawton's February 1995 letter, clearly shows that Nyman would have offered to buy the Stock had it been distributed to the Beneficiaries.

This is not to say that Nyman would have preferred to buy the Stock in ten pieces from the Beneficiaries rather than as a whole from the Estate through the co-executors. The fact that

---

[57] Keith Johnson might have lied about other things, an issue extensively litigated in Judith Lawton and Beverly Kiepler's lawsuits against Nyman principals, but there is no reason apparent in the record that he would represent that Nyman was interested in buying the Stock from the Beneficiaries if it actually was not.

Nyman actually offered to buy the Stock from the Estate rather than wait for it to be distributed clearly demonstrates that Nyman preferred buying the Stock lump sum from the Estate. Indeed, as Plaintiffs are quick to point out, at one of the meetings with the co-executors, Yesser was emphatic that Nyman would only purchase the shares of all, not some or most, of the Beneficiaries. (See Ex. 222, email dated Sep. 21, 1995 from Jeremy Weir to Tyler and others at the Bank; Facts ¶ 131.)

However, in view of the evidence referenced above, showing that Nyman was interested in buying the Stock even if it meant buying from the Beneficiaries individually, the Court is not persuaded to take this isolated instance of Yesser's rhetoric as an indication that Nyman would not have attempted to buy the Stock from the Beneficiaries. Rather, Yesser's statement seems to have been a negotiating tactic, typical of his forceful style, to pressure the co-executors to agree to a sale. It is clear from the course of communications between Nyman and the co-executors in connection with Nyman's purchase offer that Nyman's preference for buying from the Estate stemmed from its desire to avoid delay and hassle by dealing with a bank and a lawyer rather than ten laypeople. However, if the co-executors had upheld their fiduciary duties and taken a firm line in conducting due diligence and negotiating with Nyman, the sale that Nyman desired to finalize soon might have taken even longer

to complete than if it were to go through the Beneficiaries individually. What is more, to go through dutiful and hard-nosed co-executors rather than individual Beneficiaries might have resulted in a worse deal for Nyman, who might well be able to use its family ties and other powers of persuasion to convince the Beneficiaries (as it had already convinced some of them) that its offer of $145.36 was a great deal for them and even a sacrifice on Nyman's part.

In view of all this, the Court finds that, if the co-executors had upheld their fiduciary duties in dealing with Nyman's offer, Nyman would have probably withdrawn its offer to buy from the Estate, would have waited for the Stock to be distributed to the Beneficiaries, and would have renewed its purchase offer directly to the Beneficiaries.[58] Accordingly, the proper question in determining the amount of damages in connection with the sixth conclusion of law, as with the first to fourth conclusions,[59] is to ask what the Beneficiaries would have done had the Stock been distributed to them.

---

[58] Given that the parties did not call any Nyman representatives as a witness and did not focus on Nyman's actions and intentions, all inferences as to what Nyman intended and what it would have done are necessarily circumstantial and probabilistic. However, based on the evidence that the Court does have, these findings appear eminently justified.

[59] The fifth conclusion of law was that there was no breach, so the question of damages does not come into play.

Answering this question demands findings of fact tailored to each Beneficiary Plaintiff. Before turning to this individualized inquiry, it is appropriate to dispose of two questions common to all Beneficiaries: (1) to the extent the Court finds that a Beneficiary would have held on to his or her shares of the Stock until the sale to Van Leer and then would have sold to Van Leer,[60] what is the appropriate measure of damages?; and (2) to the extent the Court finds that a Beneficiary would have sold his or her shares of the Stock to Nyman pursuant to Nyman's offer, what is the appropriate measure of damages? The Court will take up these questions in turn.

i. Damages for Beneficiaries Who Would Have Held On to the Stock and Sold to Van Leer

The answer to the first question seems straightforward: the difference between the price per share in the sale to Van Leer and the sale to Nyman times the number of shares, plus interest. Both parties object to this straightforward formula, pulling from opposite directions.

The Bank argues that this measure of damages is wrong because the probate court would not have permitted the Stock to

---

[60] There is no reason to suppose that Van Leer would not have offered to buy Nyman if some shares of the Stock (which was merely non-voting stock of the Company) were held by the Beneficiaries as opposed to Nyman managers. Indeed, when Van Leer bought the Company in September 1997, it also bought shares held separately from Nyman management, including the shares held by Beverly Kiepler, individually and as part of the Walfred Nyman Trust.

be distributed and because, even if it would have permitted it, the sale to Van Leer was not a reasonably foreseeable consequence of the breach. The Court will address these arguments in turn.

"Plaintiff cannot prove with reasonable certainty that the Probate Court would have ordered in-kind distributions to the legatees notwithstanding Roland Burt's claims and the refusal of some legatees to execute indemnifications," says the Bank. (Def.'s Post-Trial Br. 95.) "In fact, the only evidence is to the contrary. On the two occasions that the Bank and Gates asked for the Court's approval of in-kind distributions, the Probate Court either did not rule on the request or denied it." (Id. at 89.) The "two occasions" the Bank has in mind are the filing of the accounting in March 1995 and the filing of the petition for distribution in September 1995. (Id. at 38.)

This argument is without merit. The accounting filed in March 1995 was not accompanied by a petition to distribute; the Bank cannot complain that the probate court did not order a distribution that it was not requested to order. Moreover, the probate court did not immediately rule on the accounting only because it was defective, showing the Estate as fully distributed when substantial assets remained in the Estate, and because it deemed it advisable that certain documents be furnished to the Beneficiaries. Facts ¶¶ 70, 95. Once the co-

executors fixed the accounting error and furnished the materials, the probate court promptly held a hearing and approved the accounting. Thus, the Bank's claim that the probate court would not have permitted a distribution because it "did not rule" on a petition to distribute in March 1995 amounts to an incorrect inference from an incorrect presumption.

The Bank's contention about the October 19, 1995 hearing is also meritless. The probate court did not order a distribution on that occasion because no one was seriously advocating for it; the co-executors peremptorily read from a petition and then sat silent as Yesser forcefully urged a sale. As discussed, it would have been completely reasonable for the probate court to conclude under the circumstances that the co-executors and Nyman were in agreement that a sale should occur. See supra at 88-89 and Facts ¶ 151. The claim that the probate court would not have ordered a distribution because it failed to order a distribution on October 19, 1995 amounts to a brazen attempt to blame the probate court for the co-executors' malfeasance-- essentially, "the probate court would not have done what it should have done because it did not do what we did not ask it to do." The probate court, if properly presented with an accounting and a petition to distribute, would have promptly approved them, just as it promptly approved the accounting once it was fixed.

As for Roland Burt's lawsuit, as the Court has already found, the petition to distribute should have been filed before Roland Burt filed suit. See supra Part II.C.ii. In any event, there is no reason to suppose that the lawsuit would have prevented the probate court from ordering a distribution, just as it did not prevent it from ordering a sale. The order to distribute could have been accompanied by an order that, in the event of a sale, a certain portion of the proceeds shall remain in escrow to satisfy the expenses potentially arising from defending Roland Burt's claims, just as the probate court ordered in connection with a sale.

As for indemnifications, as discussed, the Beneficiaries' refusal to sign them was due to the fact that the co-executors did not go about obtaining them properly. See supra Part II.C.iii. In any event, the law provides for indemnification independent of the willingness vel non of individual Beneficiaries to sign indemnity agreements, R.I. Gen. Laws § 33-13-20, and the probate court could have ordered it. Therefore, the refusal of some Beneficiaries to sign the agreements urged on them by the co-executors does nothing to decrease the likelihood that the probate court would have ordered a distribution had it been properly presented with a request to do so.

More generally, the Bank's argument that the probate court would not have ordered a distribution is essentially a rehashing of its excuses for delaying the distribution for eight long years, see supra Part II.C, and amounts to an ironic and brazen attempt to turn its own malfeasance into a shield to protect it from liability. This attempt must be rejected.[61]

Nor can it be argued that the sale to Van Leer was not reasonably foreseeable. The Bank argues that "it was simply not foreseeable in the spring of 1991 that Nyman would or could be sold in a strategic acquisition six and one-half years later." (Def.'s Post-Trial Br. 95-96.) This argument misses the mark. What needs to be foreseeable for purposes of proximate cause analysis is not the particular harm that actually transpired but some harm of the kind. Narragansett Tennis Club, 502 A.2d at 830 ("One need only reasonably foresee that an injury may result from [the breach of duty]. The particular kind of injury need not have been foreseen.") (emphasis in original) (citing Restatement (Second) of Torts § 435(2)).

Thus, in this case, proximate cause is satisfied if some sale of Nyman in the future was foreseeable during the period of failure to distribute. In view of the fact that Nyman had hired a turnaround consultant and was rapidly improving its prospects,

---

[61] The Bank also urges that Clause Tenth of the Will would have prevented the probate court from ordering a distribution. This argument has been disposed of previously.

this contingency was well within the realm of the foreseeable. Indeed, it was not only foreseeable, it was actually foreseen by the Bank. (See Ex. 222, email dated Sep. 21, 1995 from Jeremy Weir to Tyler and others at the Bank (referencing the importance of "avoiding a trap by Nyman, i.e. getting a sale done and having the company sold for a significantly higher price within a year or two thereafter").) The contingency was so front and center in everyone's minds that Nyman offered to execute a warranty that Nyman was not for sale and that no discussions for sale were being held, but the Bank failed to take it up on the offer.[62] (See id.; see also Facts ¶ 131-132.)

The Bank's argument that an eventual sale was unforeseeable because the Company was privately held and there was no public market for the Stock certainly proves too much. If it were true, executors could indefinitely delay the distribution of all private company stock with impunity, depriving beneficiaries of

---

[62] It does not matter at exactly what point Nyman began discussions for sale of the Company. The question of whether a sale was foreseeable is clearly distinct from whether a sale was actively being discussed or in the works. A sale could be reasonably foreseeable even if it was not being discussed at the time. For this reason, the Bank's arguments regarding issue preclusion are irrelevant. (See Def.'s Post-Trial Br. 98-102.) The holdings in Kiepler v. Nyman, CA No. 98-272-T, 2002 U.S. Dist. LEXIS 19630, at *32 (D.R.I. Jan. 17, 2002) and Lawton v. Nyman, CA No. 98-288-T, 2002 U.S. Dist. LEXIS 17398, at *44-45 (D.R.I. Jan. 17, 2002) had to do with knowledge of the particular sale; the proximate cause inquiry in this case concerns the foreseeability of some sale.

what is rightfully theirs and leaving them in perpetual limbo.
That cannot be the law.

Nor is there any force to the argument that the measure of
damages should be the difference between the sale price of
$145.36 per share and fair value at the time of sale. In the
oft-quoted words of the United States Supreme Court, spoken in
the stock conversion context, such a calculation

> would, in most cases, afford a very inadequate remedy
> [or] no remedy at all. The effect would be to give to
> the broker [here, the co-executors] the control of the
> stock, subject only to nominal damages. <u>The real
> injury sustained by the principal consists not merely
> in the assumption of control over the stock, but in
> the sale of it at an unfavorable time, and for an
> unfavorable price</u>.

<u>Gallagher v. Jones</u>, 129 U.S. 193, 200 (1889) (emphasis added);
<u>accord</u> <u>Schultz v. Commodity Futures Trading Comm'n</u>, 716 F.2d 136,
140 (2d Cir. 1983); <u>see also</u> <u>Randall v. Loftsgaarden</u>, 478 U.S. 647,
661-62 (1986) (holding that, in securities fraud cases, "ordinarily
the correct measure of damages . . . is the difference between the
fair value of all that the plaintiff received and the fair value of
what he would have received had there been no fraudulent conduct")
(citations, quotation marks, and brackets omitted).

Here too it would be unjust to peg the measure of value to the
time at which the Stock was sold to Nyman. There is no
significance to this point in time except that it was the moment
when the co-executors--by their malfeasance--permitted the sale of
the Stock. It was "an unfavorable time" and "an unfavorable

price," and it would be rewarding the co-executors for breaching their fiduciary duties to disregard the price at the time of sale to Van Leer (for the beneficiaries who would have held on to the Stock until then) and focus instead on the price at the time of sale to Nyman. See Ansin v. River Oaks Furniture, Inc., 105 F.3d 745, 758 (1st Cir. 1997) ("Here, the very nature of the fraud was to induce the plaintiffs to sell their stock at a time before the stock would appreciate in value . . . . To adopt defendants' argument that damages cannot exceed the price of the shares at the time of the sale would be to reward and encourage such chicanery.").

This disposes of the Bank's arguments against the measure of damages adopted by the Court. The Plaintiffs also oppose this measure, though their objection pulls in the opposite direction. Plaintiffs contend that damages should not only be measured against the price of sale to Van Leer but should also "includ[e] the amounts Nyman Mfg. shareholders were entitled to recover against Nyman Mfg. officials for their improper dilution of the value of those shares." (Pls.' Post-Trial Br. 78.) According to Plaintiffs, including this amount would increase the price per share from $1,667.38 to $2,385.97. Plaintiffs' reasoning is that, if the Stock had been distributed to the Beneficiaries and they had sold it to Van Leer, they would then have a claim for improper dilution of shares (and other wrongful conduct) against

certain Nyman principals, just as Judith Lawton and Beverly Kiepler did when they later sold their individually held shares of the Stock. See Kiepler v. Nyman, 2002 U.S. Dist. LEXIS 19630; Lawton v. Nyman, 2002 U.S. Dist. LEXIS 17398.

This claim fails because it ignores a central tenet of causation analysis--namely, that a third-party's intentional wrong is usually considered unforeseeable and a superseding cause which relieves the original tortfeasor of liability. Martin v. Marciano, 871 A.2d 911, 918 (R.I. 2005) ("If an intervening and unforeseeable intentional harm or criminal act triggers the injury to the plaintiff, the criminal act is ordinarily called a superseding cause, with the result that the defendant who negligently creates the opportunity for such acts escapes liability.") (citation and quotation marks omitted); Restatement (Second) of Torts § 448 ("The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime."); see also Testa v. Winquist, 451 F. Supp. 388, 392-93 (D.R.I. 1978)

(holding that "[o]f course, intentional conduct is more likely to constitute a superseding, unforeseeable cause for which the initial negligent tortfeasor is not liable," though cautioning that there is no "hard and fast rule" in Rhode Island).

There is no evidence, not even really a claim, that the Bank knew or should have known of the likelihood that Nyman principals would defraud Nyman shareholders by diluting the value of the Stock and by engaging in other conduct alleged in the _Lawton_ and _Kiepler_ lawsuits. The only evidence on this score referenced by Plaintiffs is Weir's email mentioned above (Ex. 222); however, that email refers only to the possibility that Nyman might be sold for a higher value, not the possibility of Nyman principals defrauding Nyman shareholders. It is difficult even to imagine how the Bank could have known of this.

Moreover, to accept Plaintiffs' invitation to include an amount for improper dilution would carry the Court far into the realm of speculation. The decision in _Lawton_ was appealed, partially overturned on appeal, reconsidered on remand, appealed again, and then settled before the second appeal was heard. The decision in _Kiepler_ was decided, appealed, then settled before the appeal was decided. _See_ Facts ¶¶ 192-193. Thus, there is no telling what was the exact amount of damages for wrongdoing by Nyman principals in those suits, such that the same could now be added to the price of sale to Van Leer. Not only that, but

there is no telling whether the other Beneficiaries would have prevailed or would have recovered just as much as Judith Lawton and Beverly Kiepler had they also sued the Nyman principals.[63] The Court is not permitted to speculate about so many unknowns. See Skaling v. Aetna Ins. Co., 742 A.2d 282, 288 (R.I. 1999) ("We have consistently held that the causal connection between negligence and a plaintiff's injury must be established by competent evidence and may not be based on conjecture or speculation."); accord Martinelli v. Hopkins, 787 A.2d 1158, 1169 (R.I. 2001).

In effect, Plaintiffs are asking the Court to hold the Bank liable for what they allege to be the wrongful conduct of some Nyman principals. But if Plaintiffs thought they had a claim against those principals, or if they thought they would have had such a claim if they had not been wronged by the Bank, they should have independently sued those principals or joined them as defendants in this suit. Of course, Plaintiffs might have had strategic reasons for not wanting to do that, but there is no reason the Bank should pay for Plaintiffs' strategic choice. It would be incorrect and unfair to penalize the Bank for a third-party's alleged fraud, especially where there has been no

---

[63] The fact that different Beneficiaries will recover different amounts in this case makes the Court all the more wary of assuming they would have recovered the same amount in other cases.

conclusive proof of the fraud or the damages resulting therefrom.

Seventh Conclusion of Law: The measure of damages for the Beneficiaries who would have held on to their shares of the Stock had it been distributed to them and would have sold them to Van Leer is the difference between the price per share in the sale to Van Leer and the sale to Nyman times the number of shares, plus interest.

Damages for Beneficiaries Who Would Have Sold the Stock to Nyman

As for the Beneficiaries who would have sold the Stock to Nyman at the time of Nyman's offer, it seems straightforward that they suffered no damages because their situation would be no different if the Stock had been distributed to them. Plaintiffs vociferously argue against this simple inference.

First, Plaintiffs claim that Nyman would not have offered to buy the Stock individually from the Beneficiaries had it been distributed to them. (Pl.'s Post-Trial Br. 79.) The Court has already disposed of this argument and has found as a matter of fact that Nyman would have offered to buy the Stock from the Beneficiaries individually. See supra at 109-113. There is no need to repeat that analysis here.

Second, Plaintiffs argue that the Beneficiaries who approved Nyman's offer--and who, by extension, would probably

have sold to Nyman had the Stock been distributed to them (see infra Part II.H)--did so in reliance on the Bank, so the Bank may not benefit from their decision to sell. (Pl.'s Post-Trial Br. 79.) However, there is not an iota of evidence that any of the Beneficiaries who approved Nyman's offer did so in reliance on the Bank. This is not surprising, given that the Bank (or Gates) never encouraged the Beneficiaries to sell their Stock to Nyman. Quite the contrary, in relaying Nyman's offer to the Beneficiaries, the co-executors were clear that they "have reached no conclusions with respect to the proposed offer by Nyman" and asked that each Beneficiary review the information sent by Nyman and make his or her own decision. This attitude of neutrality was preserved during the co-executors' subsequent communications with the Beneficiaries regarding Nyman's offer. There is no evidence, in these communications or otherwise, that the co-executors ever told or nudged the Beneficiaries to accept Nyman's offer. The Bank is guilty of many things, but encouraging the Beneficiaries to sell their Stock is not one of them.[64]

---

[64] Plaintiffs also argue that the Beneficiaries who sold their Stock to Nyman did so based on insufficient information. (Pl.'s Post-Trial Br. 79.) But the co-executors made no representations to the Beneficiaries as to the sufficiency of the information. Nor does it appear, as the following individualized discussion of each Beneficiary's damages will show, that the decision of any of the Beneficiaries who approved the offer would have changed if they had been provided with more

Next, Plaintiffs argue that, even if some Beneficiaries would have sold to Nyman if their Stock had been distributed to them, they would have had a claim against certain Nyman principals, so the Bank should be liable to them. The Court has already disposed of this argument and concluded that it is not proper to hold the Bank accountable for Nyman's malfeasance, if any.

Finally, Plaintiffs argue that "the Bank should not be allowed to avail itself of th[e] argument" that some Beneficiaries would have sold their Stock to Nyman, because "[i]t is the Bank that failed to protect the Beneficiaries' interest and allowed the stock to be sold without opposition" and "wronged the beneficiaries." (Pls.' Post-Trial Br. 78.) This amounts to no more than saying that the Court should disregard the elements of causation and harm and impose damages on the Bank simply because it breached its fiduciary duties. Obviously, the Court cannot do that.

<u>Eighth Conclusion of Law</u>: The Beneficiaries who would have sold their shares of the Stock to Nyman pursuant to its offer had they been distributed to them are not entitled to recover anything for the Bank's breaches of fiduciary duties.

---

materials. It appears that those who approved did so out of trust in Nyman or out of a general intuition that it was giving them a great deal, not based on poring over the furnished data. (Of course, none of this justifies the co-executors' failure to do their due diligence in response to Nyman's offer; but we are talking here about damages, not breach.)

H.    Damages to Particular Beneficiaries

Having answered the general questions pertaining to damages, the Court is now in a position to turn to findings of fact with respect to the damages suffered by each Beneficiary.

i. Judith Lawton

Judith Lawton approved Nyman's offer. She was eager to do so, because she believed that the price of $145.36 per share offered by Nyman was a great deal for the Beneficiaries and even represented a sacrifice on Nyman's part.[65] Contemporaneous evidence so clearly evinces Judith Lawton's intention to sell that Plaintiffs concede that she would have sold her shares of Stock to Nyman if they had been distributed to her. (Pls.' Post-Trial Br. 49.) However, Plaintiffs claim that "she would not have sold at that point" but "would have put it with the stocks she had received from her father" and "sold them to Nyman Mfg. in May 1996, along with the rest of her shares, for $200 per share." (Id.) This inference is insupportable, as Judith Lawton quickly approved Nyman's offer at the price of $145.36. The Court finds that Judith Lawton would have sold her shares of

---

[65] As previously indicated, Judith Lawton's eagerness to accept Nyman's offer was due in no small part to her being swayed toward it by Keith Johnson, who might not have been truthful with her. However, again, it is not proper to penalize the Bank for any claim Judith Lawton might have had against Keith Johnson or other Nyman principals.

Stock to Nyman for $145.36 per share had they been distributed to her.  Accordingly, she is not entitled to any damages.

ii. Raymond Cyr

Raymond Cyr initially rejected Nyman's offer and approved it a few days later, only after being duped by Robert Nyman into thinking that all other Beneficiaries had approved the offer and that he was the only person holding up a sale.  Facts ¶¶ 122, 124-126.  If Raymond Cyr's shares had been distributed to him and Nyman had made an offer to each Beneficiary individually, there would have been no opportunity for Robert Nyman to defraud Raymond Cyr in this way.  Thus, the fact that Raymond Cyr approved Nyman's offer does not necessarily indicate that he would have approved it and sold his shares had they been distributed to him.  Rather, based upon his initial disapproval of the offer, it seems more likely that he would not have sold his shares at $145.36 per share.  (See also Def.'s Ex. B, letter dated Dec. 14, 1995 from Raymond Cyr to Roland Burt ("I have to admit, I wish they had sent me my share of the stocks instead of selling it as she did have some good ones.").)  So what would Raymond Cyr likely have done?

In communicating his initial disapproval, Raymond Cyr indicated, "I want at least $65,000 for my 1/10 no less.  I have some interest in it for that."  Cyr got the $65,000 figure ($288.12 per share) from a conversation that he had had with

Tyler in 1989, when he had come to Rhode Island from Florida after the death of his sister. Tyler had told him then that his shares of the Stock were worth "ballpark" around $60,000 – $70,000 depending on the market, and the number had stuck with him. Facts ¶ 122. At trial, Raymond Cyr testified that he would have sold his shares of the Stock for $65,000 in August 1995, when he rejected Nyman's offer. (Trial Tr. 153, Oct. 28, 2010.) The Court finds this testimony to be honest, in conformity with contemporaneous evidence, and credible.

Thus, it is clear that Raymond Cyr would not have sold his Stock for $145.36 per share but would have sold for $288.12 per share (for a total of $65,000). What is less clear is if he ever would have had an opportunity to sell his shares at that price. In other words, would Nyman have been willing to up the offer price from $145.36 per share if certain Beneficiaries rejected that offer, or would the rejecting Beneficiaries have been left without an offer until around the time of the sale to Van Leer in 1997? This is a difficult counterfactual question to answer, and there is really no solid evidence on which to base a definitive answer. However, based on the fact that Nyman was willing to pay $200 per share when it later offered to buy the shares of Stock held separately by Judith Lawton and Beverly Kiepler (see Facts ¶ 185), the Court finds it more likely that Raymond Cyr would have had an opportunity to sell his Stock for

the price per share of $288.12, which he found desirable, and would have sold them at that price, rather than waiting for the much higher price per share offered by Van Leer. Accordingly, Raymond Cyr is entitled to recover from the Bank the difference between $65,000 and the price he received from the sale to Nyman, plus interest.

### iii. Carol Lincoln

Carol Lincoln rejected Nyman's offer. At trial, she testified as to the reason:

> I was a little suspicious of it. I was just kind of curious of it [sic] because of the fact that they had offered so many times to Nyman to sell these stocks where Nyman had refused. Then all of a sudden now Nyman wants to buy the stock. And he only gave so many days, like hurry, hurry, to make a decision. And I just didn't feel comfortable with it . . . .

(Trial Tr. 165, Oct. 28, 2010; see also Trial Tr. 17-18, Oct. 29, 2010 (testifying to the same effect).) Carol Lincoln also testified that she attempted to object at the probate court hearing when the probate judge ordered the Stock sold, but the probate judge would not hear her. (Trial Tr. 167, Oct. 28, 2010.) Afterwards, she expressed her dismay to Tyler, but Tyler told her that the process had been proper. (Id. at 168.)

This testimony was uncontradicted and appears honest and credible. In view of this, the Court believes Carol Lincoln when she says she would have held on to the Stock had it been distributed to her. (See id. at 168.) It also appears from the

whole of Carol Lincoln's testimony, including the portion quoted above, that she was a prudent individual, not given to hasty decisionmaking, and capable of a commonsense mulling over of options before her. Thus, the Court has little difficulty in concluding that she would have held on to her shares of the Stock and would have sold them to Van Leer. Accordingly, Carol Lincoln is entitled to recover from the Bank the difference between the price per share in the sale to Van Leer and the sale to Nyman times the number of her shares, plus interest.

     iv. June Gilmore

June Gilmore was no longer alive at the time of Nyman's offer. Her interests are represented in this case by her son David Gilmore, who was a co-executor of her estate along with Robert Gates. David Gilmore approved Nyman's offer. Explaining this decision, he testified at trial that he did not know what it was that he was signing; Gates mailed him the form and told him to sign it and he signed it. (Trial Tr. 45, 47, Nov. 1, 2010.) He testified that he regrets having approved Nyman's offer and that, if the Stock had been distributed, he would have kept it and sought a professional stockbroker's advice as to how much it is worth and what should be done with it. (Id. at 48.)

For obvious reasons, a competent adult's testimony that he did not understand what he was doing when he signed a document written in plain English and that he was simply following

someone else's directions are not convincing. David Gilmore's testimony about keeping the Stock seems like a decision in hindsight rather than a reflection of the decision he would have made at the time. In view of the fact that he approved Nyman's offer, the Court finds that David Gilmore would have sold his shares for $145.36 had the Stock been distributed to him. Accordingly, David Gilmore, on behalf of June Gilmore, is not entitled to recover anything from the Bank.

     v. Janice Leffingwell

Janice Leffingwell approved Nyman's offer. Her approval was conditional, but the condition had to do with transaction expenses and fees, not price. (See Facts ¶¶ 119, 127; Ex. 211, approval form signed by Janice Leffingwell; Trial Tr. 67, Nov. 1, 2010.) She testified that time constraints affected her decision to approve the offer and that she was under pressure and did not want to hold things up. (Trial Tr. 60, Nov. 1, 2010.) She also testified that she talked to her sisters after approving the offer and realized that she had made a mistake. (Id.) "I would have been better off if I had held onto my shares and probably in the future had gotten a better offer." (Id.) Finally, she testified that she wished the Stock had been distributed at the probate court hearing so that she could receive it and hold on to it until she got a better offer, at which point she would consult an expert. (Id. at 62-63.)

This seems like a decision in hindsight. There is no contemporaneous evidence indicating that Janice Leffingwell wished to receive her shares of the Stock rather than sell them to Nyman. Her action to sell at the time speaks louder than her testimony after the fact. And if she genuinely regretted her decision to sell immediately afterwards, it is not clear why she did not seek to revoke her acceptance, as Beverly Kiepler did. See Facts ¶ 127; see also infra Part II.H.viii. All things considered, the Court finds that Janice Leffingwell would have sold her shares for $145.36 if they had been distributed to her. Accordingly, she is not entitled to recover damages from the Bank.

vi. Joyce Hendricks

Joyce Hendricks did not respond to Nyman's offer, which operated as a rejection. She testified that she did not respond because she only had four days to make a decision and she did not feel she had enough information to decide in that short time frame. (Trial Tr. 81, Nov. 1, 2010.) She also testified that, if the Stock had been distributed to her, she would have held on to it and, if faced with an offer to sell, would have sought a second opinion from a person knowledgeable about stocks to determine whether the offer price was fair. (Id. at 83.) Having considered her demeanor and other relevant factors, the Court finds Joyce Hendricks' testimony to be honest and

credible. In light of her testimony and, more importantly, in light of her actions at the time, the Court finds that Joyce Hendricks was a prudent person and unlikely to make a hasty decision to sell and believes her testimony that she would have sought a second opinion.

On cross-examination, the Bank attempted to discredit Joyce Hendricks's testimony that she would have sought a second opinion from a knowledgeable person based on the fact that she did not seek the Bank's opinion at the time. This attempt is unavailing, for several reasons. First, as Joyce Hendricks testified, the tight time frame imposed by Nyman and further tightened by the co-executors (see Facts ¶¶ 105, 121) made any meaningful deliberation and discussion difficult. Second, by the time of Nyman's offer, many of the Beneficiaries had had run-ins with the co-executors, had grown sick and tired of the Bank's delays, and were not on the best of terms with the Bank. Thus, it is no surprise that they did not seek the Bank's advice. Last but not least, the Bank was clear that it had "reached no conclusions with respect to the proposed offer by Nyman" and that it wanted the Beneficiaries to make the decision on their own, so there would have been no point in consulting the Bank.

The Bank also pointed to portions of the deposition of Joyce Hendricks during which, after successive aggressive

questions accompanied by deponent's statements that she did not understand what was being asked of her, the Bank got Joyce Hendricks to say that there was no amount of money she would have accepted in lieu of the Stock. (Trial Tr. 86-90, Nov. 1, 2010.) The Court is confident that what Joyce Hendricks meant by this statement is that, at the time of Nyman's offer, given her inability to adequately evaluate the offer or value the Stock due to the tight time frame for decision and the other stringent conditions of the offer, she would rather have had the Stock distributed to her than accept any amount of money for it; she did not mean that she would never ever part with the Stock no matter how much money was offered for it. This conclusion is compelled both by the words of the Bank's questions during the deposition--"[a]s of the time of the offer" and "at the time" (id. at 88)--and by considering the deposition testimony quoted at trial in its entirety and in conjunction with the witness's trial testimony.

In sum, the Court finds that, if her shares of Stock had been distributed to her, Joyce Hendricks would have held on to them and would have sold them to Van Leer. Accordingly, she is entitled to recover from the Bank the difference between the price per share in the sale to Van Leer and the sale to Nyman times the number of her shares, plus interest.

vii.  Joan Grant

In April 1995, Joan Grant explicitly told Tyler that she did not wish to sell her shares until she retired. (Ex. 161, letter dated Apr. 26, 1995 from Joan Grant to Tyler, with a copy to the probate court; Facts ¶ 87.) She did not respond to Nyman's offer, which operated as a rejection. She testified that she did not respond because she had told Tyler earlier that she was not interested in a sale. (Trial Tr.102-03, Nov. 1, 2010.) She testified that, at the time of the offer, she was planning to retire at sixty-five, which she did in September 1999, on the day of her sixty-fifth birthday. (Id. at 92, 99.) According to Joan Grant, she did not have a retirement fund and planned to hold on to the Stock until her retirement, then sell it and put the proceeds in a retirement fund. (Id. at 99.) Joan Grant also testified that she tried to speak at the October 19, 1995 probate court hearing to object to a sale of her shares without her consent, but the probate judge would not hear her. (Id. at 105.) The Bank did not contradict or undermine this testimony, and the Court finds it to be honest and credible. It is almost certain that Joan Grant would have held on to her shares and would not have sold them to Nyman if they had been distributed to her.

But would she have sold even to Van Leer, given that Van Leer's offer came in September 1997, two years before she

retired?  When asked on direct examination what she would have done with the Stock had it been distributed to her, Joan Grant responded, "I would have kept it until I was 65 and cashed it in."  (Id. at 107.)  The Bank pursued this line of inquiry on cross-examination:

> Bank:  [If the Stock had been distributed,] you would have held it until September of 1999, correct?
>
> Joan Grant:  Exactly.  Exactly.
>
> Bank:  And even if someone had come and offered you money before September of 1999, you weren't going to sell it because you wanted to hold it until you retired, right?
>
> Joan Grant: That's true.

(Id. at 111.)  Thus, by her own admission, Joan Grant would not have sold her Stock to Van Leer in 1997.

The impact of Joan Grant's intention to hold her Stock until September 1999 on her proper measure of damages is unclear.  The Bank contends that Van Leer's acquisition of Nyman was a failure and that the Company went bust by 2000.  (Def.'s Post-Trial Br. 44.)  Plaintiffs have not contradicted this testimony.  Ultimately, because the burden of establishing damages rests with the plaintiff, see, e.g., Olshansky v. Rehrig Int'l, 872 A.2d 282, 289 (R.I. 2005), and Plaintiffs have not introduced any evidence to enable an adequate assessment of Joan Grant's damages, the indeterminacy of the evidence must count

against Plaintiffs.[66]  Accordingly, Joan Grant is not entitled to recover damages from the Bank.

### viii. Beverly Kiepler

Beverly Kiepler died on March 2, 2006, and is represented in this litigation by her then husband John Kiepler, who was also the executor of her will.  Beverly Kiepler initially approved Nyman's offer but then changed her mind and disapproved.  Ostensibly, her change of heart had to do with a realization that the offer came with an indemnification requirement, which she could not accept.  (<u>See</u> Ex. 239, fax dated Oct. 18, 1995 from John Kiepler to Gates.)  However, at trial, John Kiepler testified that Beverly Kiepler did not want

---

[66] In their post-trial reply brief (at 17), Plaintiffs argue that Joan Grant could not have refused to sell her shares to Van Leer because "Class A shares did not hold any voting rights, and therefore any Class A shareholder, including . . . Grant, would have lacked authority to oppose or withhold shares from that sale."  This last-ditch argument is without merit.  First, Plaintiffs have cited to no evidence or legal authority to support the proposition that all holders of the Stock could be compelled against their will to sell their shares.  Whether this is true presumably depends on Rhode Island corporate law as well as pertinent provisions in the bylaws and articles of association and other corporate documents of Nyman.  Without any reference to any of these sources, the Court cannot accept Plaintiffs' <u>ipse dixit</u> that Joan Grant could have been compelled to sell to Van Leer against her will.  Even if she could have, would it have been worth it for Van Leer and/or Nyman to so compel her, given that her shares were non-voting anyway?  And even assuming, as Plaintiffs do, that they could and would compel her to sell, they would presumably compel her to sell at a low price, not at the high price of $1,667.38 per share.  Plaintiffs' theory is simply too speculative to be taken seriously.

to sell even initially but was afraid that, if she rejected the offer, she would strain her relations with her brothers, who were then managers at Nyman, as well as with her mother. (Trial Tr. 157-58, Nov. 1, 2010.) According to John Kiepler, Beverly Kiepler thought the transaction would not go through anyway under the terms of the offer (which required the Beneficiaries' unanimous approval), so she thought she might as well vote yes so as not to get into trouble with her mother and brothers. (Id.) The indemnification objection, according to John Kiepler, was thus just a nice reason for refusal that Beverly Kiepler could use to avoid getting into trouble with her family for refusing Nyman's offer. (Id. at 159.)

The Court is not sure how credible this testimony is, and is not sure what Beverly Kiepler was thinking when she first approved and then disapproved Nyman's offer. What is clear, however, is that at the end of the day she did not want to sell her Stock to Nyman. This conclusion is borne out by the fact that she ultimately refused Nyman's offer, as well as by considering what she did with her own shares of the Stock. As previously mentioned, Judith Lawton and Beverly Kiepler separately held shares of the Stock apart from what they got under the Will. In Beverly Kiepler's case, some of these separate shares were held personally under her own name and some through the Walfred Nyman Trust. (Trial Tr. 135, Nov. 1, 2010.)

In May 1996, Nyman made a bid for these shares for $200 per share. Judith Lawton sold, but Beverly Kiepler did not. She said she would hold on to her shares as long as her brothers (managers of Nyman) held on to theirs. And that is just what she did: she held on to her shares and sold them to Van Leer in September 1997. (See Facts ¶ 186; Trial Tr. 172, Nov. 1, 2010.)

Considering all this, the Court finds that, if her shares of the Stock had been distributed to her, Beverly Kiepler would have held on to them and would have sold them to Van Leer. Accordingly, Beverly Kiepler, through John Kiepler, is entitled to recover from the Bank the difference between the price per share in the sale to Van Leer and the sale to Nyman times the number of her shares, plus interest.

ix. Janis Fisher

Janis Fisher never formally responded to Nyman's offer, which operated as a rejection. At trial, Janis Fisher appeared to remember next to nothing about the relevant events. She did not even remember whether the Stock was sold or distributed. (Trial Tr. 171, May 9, 2011.) When asked on direct examination what she would have done with her shares of the Stock had they been distributed to her, she responded that she does not know. (Id. at 174.) On cross-examination, portions of her deposition testimony were read where she responded to the same question by stating that she did not have "the faintest idea." (Id. at

182.) And she stated that she does not know how, if at all, she has been affected by the delay in the administration of the Estate. (Id. at 181.)

Again, the burden of proving damages is on the plaintiff. Olshansky, 872 A.2d at 289. Where the Beneficiary cannot meaningfully testify as to what she would have done if the Stock had been distributed to her, and where there is no other competent evidence on this score, Plaintiffs have failed to carry their burden. Accordingly, Janis Fisher is not entitled to recover anything from the Bank.

I.   Co-Executors' Fees

On October 19, 1995, in allowing the co-executors' accounting, the probate court also approved the sum of $81,618 in fees for the co-executors.[67] The question of whether to require a return of these fees "is committed to the discretion of the Court." Dennis v. R.I. Hosp. Trust Nat'l Bank, 571 F. Supp. 623, 638 (D.R.I. 1983) (citing Restatement (Second) of Trusts § 243), aff'd as modified, 744 F.2d 893 (1st Cir. 1984). The Restatement counsels consideration of the following factors to guide the exercise of this discretion:   "(1) whether the trustee acted in good faith or not; (2) whether the breach of

---

[67] The co-executors had previously paid themselves these fees and sought probate court approval retroactively.   The parties dispute whether this was an unusual practice; it does not matter for our purposes.

trust was intentional or negligent or without fault; (3) whether the breach of trust related to the management of the whole trust or related only to a part of the trust property; (4) whether or not the breach of trust occasioned any loss and whether if there has been a loss it has been made good by the trustee; (5) whether the trustee's services were of value to the trust." Restatement (Second) of Trusts § 243 cmt. c.

In this case, most of these factors cut against restitution of the fees: Although the co-executors were negligent, there has been no showing of bad faith, intentional misconduct, or improper motive; the breach of duty related only to part of the Estate property; to the extent the breach of duty occasioned a loss to Plaintiffs, it is being compensated for per this order of this Court; and the services of the co-executors were generally of value to the Estate, though they did not do right by the Beneficiaries in some respects. Nor is there any reason to second-guess the judgment of the probate court that the fees were not excessive. Here, as in Dennis, "[a] disallowance of fees would be a windfall to the current beneficiaries and the Court has already provided for making good any loss to the [Estate]." 571 F. Supp. at 638 (refusing to deprive the trustee of compensation where there had been no showing of bad faith and the fees charged were reasonable). Therefore, Plaintiffs are not entitled to recover the fees charged by the co-executors.

J.  Restatement of Conclusions of Law as Applied to Particular Plaintiffs

1.  The Plaintiffs who would have held on to their shares of the Stock had it been distributed to them and would have sold them to Van Leer are entitled to recover from the Bank the difference between the price per share in the sale to Van Leer and the sale to Nyman times the number of shares, plus interest. These Plaintiffs are Carol Lincoln, Joyce Hendricks, and Beverly Kiepler (through John Kiepler).

2.  The Plaintiffs who would have sold their shares of the Stock to Nyman for $145.36 had they been distributed to them are not entitled to recover anything for the Bank's breaches of fiduciary duties.  These Plaintiffs are Judith Lawton, June Gilmore (through David Gilmore), and Janice Leffingwell.

3.  Raymond Cyr is entitled to recover from the Bank the difference between $65,000 and the price received from the sale of his shares to Nyman, plus interest.

4.  Joan Grant is not entitled to recover anything from the Bank because she would not have sold her shares of the Stock even to Van Leer and would have held on to them until September 1999, and she has not introduced any evidence that would enable an adequate assessment of her damages.

5.  Janis Fisher is not entitled to recover anything from the Bank because she has marshaled no evidence as to what she

would have done with her shares of the Stock if they had been distributed to her.[68]

6.   Plaintiffs are not entitled to recover the fees charged by the co-executors.

III. CONCLUSION

For the foregoing reasons, the Bank is liable in the amounts established above.   The parties shall submit for the Court's approval and entry a consented-to order consistent with the conclusions reached in this opinion.


IT IS SO ORDERED.


_/s/ William E. Smith_
William E. Smith
U.S. District Judge
Date:  August 24, 2011

---

[68] In deciding the recovery to be had by each Plaintiff, the Court is aware of the possibility that Plaintiffs might have agreed beforehand to divide the aggregate amount of recovery in this case.   This opinion and order is without prejudice as to any such agreement, and the Court expresses no view as to its validity _vel non_.